Grover Melvin MUNGO, Samuel Harris
and Daniel Simms, Jr., Appellants,

v.

UNITED STATES of America,
Appellee.

No. 13143.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 7, 1969.

Decided April 9, 1970.

Sidney H. Kelsey, Norfolk, Va. (Kelsey & Owens, Norfolk, Va., on brief), for appellants.

Roger T. Williams, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on brief), for appellee.

Before BOREMAN, BRYAN and WINTER, Circuit Judges.

BOREMAN, Circuit Judge.

Appellants Mungo, Harris and Simms appeal from their convictions by a jury

on charges of willfully removing, breaking and injuring a fastener on a container then in customs custody and containing 650 cases of Scotch whiskey; of transporting one case of this whiskey knowing that it had been unlawfully removed from customs custody; and of stealing and unlawfully taking and carrying away one case of the whiskey when moving as part of a foreign shipment of freight. Mungo was sentenced to eighteen months, Harris to sixteen months, and Simms to fifteen months, portions of the terms to be suspended. However, prior to the pronouncement of sentence, appellants moved to set aside the guilty verdicts and for judgments of acquittal, which motions were denied. We affirm the judgments below.

This prosecution was based upon the alleged illegal acts of appellants subsequent to the arrival, on February 22, 1968, at the Imperial Docks, Norfolk, Virginia, of a ship's container loaded with whiskey imported from Scotland. The container had been removed from the ship and placed on a flat-bed trailer which was parked adjacent to Imperial's warehouse. The container was not placed in a bonded warehouse or terminal for receipt or storage of goods within customs control.

Customs agents, maintaining surveillance of the container, checked it on February 26, at 7:15 p. m., determined that it was locked and observed that there were no cardboard cartons on the ground in the immediate area. The agents concealed themselves until they were relieved by two other customs agents at 11:50 p. m. At 12:35 a. m., on February 27, two agents then on duty observed two men who entered the parking area and proceeded to the rear of the container where they remained for a short time. The agents testified that these two men then ran in a semi-crouching position to a public street where they entered a Ford automobile. The Ford proceeded along the street, followed by a Pontiac which pulled out of a nearby service station. The two cars stopped side by side some distance down the street and remained in that position for approximately one minute before advancing out of the agents' view. Both automobiles returned a few minutes later and two occupants of the Ford, who appeared to the agents to be the same men who had earlier entered the car, got out. One of the men walked to the Pontiac and then rejoined his companion. The agents observed these two men running in a semi-crouching position to an area near the container, that one of the men went to the rear of the container, partially disappeared from view but shortly reappeared behind the container. The man was observed waving his arm and then walking toward the middle of the parking area where he blinked a flashlight, apparently signaling the driver of the Pontiac. The Pontiac, with lights turned off, proceeded to the rear of the container where the trunk of the car was opened.

Upon being suddenly alarmed, the two men closed the trunk and hastily entered the Pontiac, which started to leave the scene, still without lights. A government automobile, with its lights flashing, gave chase and the driver of the Pontiac, who was later identified as Mungo, accelerated in an apparent attempt to escape. The agents' automobile was maneuvered into a blocking position and a collision ensued, after which Mungo made a further effort to escape by placing the Pontiac in reverse and backing up some distance. He was thwarted when one of the agents went to the driver's side of the Pontiac and arrested the occupants, Mungo, Harris and Simms, who were in the front seat. A search of the car disclosed a lug wrench lying on the floor and a later spectrochemical analysis established that metal smears on the end of the steel wrench were an aluminum alloy similar to the door of the container. However, the amount of aluminum on the wrench was so small that it was impossible to determine whether its composition was the same as that of the container door.

After the arrests, appellants and the agents returned to the container. A case of whiskey was discovered on the ground

and one of the doors to the previously locked container was found open. Appellants were taken to customs headquarters where they were interrogated. They signed statements in which they asserted that they, being ships' cargo checkers, had observed that the whiskey container door was open, that they had investigated, and that they were leaving to report the situation to the police when they were arrested.

A "consumption entry" form for the whiskey had been filed properly with the Customs Service and the estimated duty was paid on February 26, 1968. The form was examined by a customs import specialist who, assuming that the information set forth in the form was correct and that the duty had been estimated properly, determined that entry could be made after the contents of the container had been inspected. Notations which the customs specialist made on the form indicated that one case from each of the three lots of whiskey in the container was to be examined, gauged and inspected to see that stamps denoting payment of the tax on distilled spirits had been affixed properly to the bottles before shipment in foreign commerce. A copy of this form was delivered to a customs inspector after payment of the

estimated duties had been received by the customhouse cashier on February 26. The customs inspector performed the required inspection sometime after coming on duty at 8:00 a. m. on February 27. He signed the consumption entry form indicating that he had examined the whiskey, and sometime during the afternoon of February 27 notified the terminal manager that the merchandise had been released from customs custody and control.

On appeal, appellants attack the jurisdiction of the lower court as to counts one and two which charged violations of 18 U.S.C. § 549 [1] by asserting: (1) that the Customs Service never had custody of the whiskey; and (2) that even if the Customs Service did have custody, payment of the estimated duties on February 26 terminated such custody prior to the alleged offenses. Also, appellants challenge the sufficiency of the evidence as to count three, which under 18 U.S.C. § 659 [2] charged that appellants stole and unlawfully carried away one case of the whiskey which was moving as part of a foreign shipment.

In challenging jurisdiction as to counts one and two, appellants contend that 19 U.S.C. § 1490 [3] provides the *only* method

---

1. 18 U.S.C. § 549

     *     *     *     *     *

    Whoever, without authority, willfully removes, breaks, injures, or defaces any customs seal or other fastening or mark placed upon any vessel, vehicle, warehouse, or package containing merchandise or baggage in bond or in customs custody; or

    Whoever, maliciously enters any bonded warehouse or any vessel or vehicle laden with or containing bonded merchandise with intent unlawfully to remove therefrom any merchandise or baggage therein, or *unlawfully removes any merchandise* or baggage in such vessel, vehicle, or bonded warehouse or *otherwise in customs custody* or control;

     *     *     *     *     *

(Emphasis supplied.)

2. 18 U.S.C. § 659

    Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from

any railroad car, wagon, motortruck, or other vehicle, or from any station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight or express;

     *     *     *     *     *

3. 19 U.S.C. § 1490

    (a) Whenever entry of any imported merchandise is not made within the time provided by law or the regulations prescribed by the Secretary of the Treasury, or whenever entry of such merchandise is incomplete because of failure to pay the estimated duties, or whenever, in the opinion of the collector, entry of such merchandise can not be made for want of proper documents or other cause, or whenever the collector believes

by which the Customs Service may gain custody of imported goods. This section provides that whenever entry of imported merchandise is not made in accordance with law or whenever the estimated duties are not paid, the customs collector shall take the merchandise "into his custody" and send it to a bonded warehouse or public store to be held at the risk of the consignee until there has been compliance with the regulations or until bond has been posted.

The parties agree that constructive customs custody has not been a subject of prolific contention or litigation and it appears that the issue here presented has not been raised heretofore in a reported criminal proceeding. Appellants urge that 18 U.S.C. § 549 (*supra* at footnote 1) is intended to apply *only* in situations in which merchandise has already been taken into customs custody and placed in a bonded warehouse or public store under the provisions of 19 U.S.C. § 1490 (*supra* at footnote 3); and, since the whiskey in question actually had not been taken into customs custody under 19 U.S.C. § 1490, the Customs Service never did gain custody.

It is clear that the whiskey here involved had not been taken into customs custody for warehousing purposes pursuant to 19 U.S.C. § 1490. However, this fact is not necessarily dispositive of another question, namely, whether such merchandise shipped in foreign commerce is immediately in constructive customs custody upon arrival in this country. Due to the paucity of pertinent litigation our attention is first directed to an early Supreme Court decision for possible assistance and enlightenment. In Harris v. Dennie, 28 U.S. 292, 304, 3 Peters 292, 304, 7 L.Ed. 683 (1830), the Court stated:

"From the moment of their arrival in port, the goods [imported from a foreign country] are, in legal contemplation, in the custody of the United States; and every proceeding which interferes with, or obstructs or controls that custody, is a virtual violation of the provisions of the act [the Revenue Collection Act of 1799]."

■ From an examination of relevant statutes, we are persuaded that Congress intended that imported merchandise should be in constructive customs custody at the moment of its arrival in this country. 19 U.S.C. § 1448(a)[4] directs that

that any merchandise is not correctly and legally invoiced, he shall take the merchandise into his custody and send it to a bonded warehouse or public store, to be held at the risk and expense of the consignee until entry is made or completed and the proper documents are produced, or a bond given for their production.

(b) At the request of the consignee of any merchandise, or of the owner or master of the vessel or the person in charge of the vehicle in which the same is imported, any merchandise may be taken possession of by the collector after the expiration of one day after the entry of the vessel or report of the vehicle and may be unladen and held at the risk and expense of the consignee until entry thereof is made.

4. 19 U.S.C. § 1448(a)

(a) Except as provided in section 1441 of this title (relating to vessels not required to enter), no merchandise, passengers, or baggage shall be unladen

from any vessel or vehicle arriving from a foreign port or place until entry of such vessel or report of the arrival of such vehicle has been made and a permit for the unlading of the same issued by the collector: *Provided*, That the master may make a preliminary entry of a vessel by making oath or affirmation to the truth of the statements contained in the vessel's manifest and delivering the manifest to the customs officer who boards such vessel, but the making of such preliminary entry shall not excuse the master from making formal entry of his vessel at the customhouse, as provided by this chapter. After the entry, preliminary or otherwise, of any vessel or report of the arrival of any vehicle, the collector may issue a permit to the master of the vessel, or to the person in charge of the vehicle, to unlade merchandise or baggage, but *except as provided in subdivision* (b) of this section merchandise or baggage so unladen shall be retained at the place of

merchandise may not be unloaded from a vessel arriving from a foreign port until a permit for unloading the same has been issued by the customs collector; thereafter the merchandise must be retained at the place of unloading until entry is made for such merchandise and a permit for its delivery is granted.

Similarly, 19 U.S.C. § 1484(j), obviously enacted to protect the collector of customs in releasing merchandise from custody to the person claiming the right to receive the same, declares, in pertinent part:

> "*Merchandise shall be released from customs custody only to or upon the order of the carrier by whom the merchandise is brought to the port at which entry is made,* except that merchandise in a bonded warehouse shall be released from customs custody only to or upon the order of the proprietor of the warehouse." (Emphasis added.)

The statutory language, emphasized above, was adopted in obvious recognition of the fact that foreign imports of goods are in constructive customs custody upon arrival in this country. The unemphasized language refers to merchandise which has been placed in a bonded warehouse, as is possible under 19 U.S.C. § 1490. By specific reference to merchandise which has been warehoused and at the same time including a specific reference to unwarehoused merchandise in customs custody, Congress obviously intended that foreign imports of merchandise, even though not warehoused, are to be in constructive customs custody upon their arrival here.

Another federal statute, 19 U.S.C. § 1499, provides in part:

> "Imported merchandise, required by law or regulations made in pursuance thereof to be inspected, examined, or appraised, *shall not be delivered from customs custody*, except under such bond or other security as may be prescribed by the Secretary of the Treasury to assure compliance with all applicable laws, regulations, and instructions which the Secretary of the Treasury or the Customs Service is authorized to enforce *until it has been inspected, examined, or appraised and is reported by the appraiser to have been truly and correctly invoiced and found to comply with the requirements of the laws of the United States.*" (Emphasis added.)

This statute is applicable to all foreign imports subject to inspection, examination or appraisal. Thus the provision, "shall not be delivered from customs custody," further reveals the intent of Congress that the Customs Service should have constructive custody of all such imports.

▪ Appellants rely upon a decision by the Court of Customs and Patent Appeals, Cargill Grain Co., Inc. v. United States, 30 CCPA (Customs) 78 (1942), as supporting their contention that goods may be taken into customs custody *only* pursuant to 19 U.S.C. § 1490 (*supra* at footnote 3). In *Cargill* imported grain was sent by the customs collector to a bonded grain elevator owned by the importer at the latter's request. The grain was inspected by the Department of Agriculture and found to contain numerous

unlading until entry therefor is made and a permit for its delivery granted, and the owners of the vessel or vehicle from which any imported merchandise is unladen prior to entry of such merchandise shall be liable for the payment of the duties accruing on any part thereof that may be removed from the place of unlading without a permit therefor having been issued. Any merchandise or baggage so unladen from any vessel or vehicle for which entry is not made

within forty-eight hours exclusive of Sunday and holidays from the time of the entry of the vessel or report of the vehicle, unless a longer time is granted by the collector, as provided in section 1484 of this title, shall be sent to a bonded warehouse or the public stores and held as unclaimed at the risk and expense of the consignee in the case of merchandise and of the owner in the case of baggage, until entry thereof is made.

impurities, but Department officials granted permission to the importer to recondition the grain by removing the impurities *under customs supervision*. The grain was reconditioned, but the process resulted in a quantitative loss of grain. The importer claimed the grain should be treated under another section (§ 562) of the Tariff Act of 1930 which would have allowed the grain to be assessed for duties at the quantity at which it entered the commerce of the United States (*i. e.,* the quantity after reconditioning) rather than at the quantity prior to reconditioning. Consumption entries had been made for the grain, the amount of estimated duties had been deposited, and delivery permits had been issued; however, no entry for warehousing had been made. Since § 562 specifically referred to merchandise being "withdrawn from bonded warehouse," the court held that § 562 was intended to apply only to merchandise which had been entered for warehousing and was not to apply to merchandise for which consumption entries had been made and delivery permits issued. The court further held that merchandise for which consumption entries had been made, estimated duties deposited, and *delivery permits issued* was no longer in customs custody since the collector had performed all of his duties in relation to that merchandise. *Cargill* is clearly distinguishable from the instant case since here no permit for delivery of the whiskey had been issued. In *Cargill* the court's reliance upon the fact that delivery permits had been issued is evidenced by quoting, with approval, from the opinion of the lower customs court as follows:

> "After the duties were paid *and the delivery permits issued,* the collector had performed all of his duties in connection with the imported merchandise. Any detention of the merchandise thereafter would have been for other than customs purposes. * * * All actions taken by the customs authorities *after the issuance of the delivery permits* were performed as agents of the Department of Agriculture. The

custody of the merchandise in warehouse was in fact the custody of the Department of Agriculture rather than the collector." 30 CCPA (Customs) 78, 85. (Emphasis added.)

▮ Appellants claim that *constructive* customs custody is not sufficient to support their convictions under counts one and two because constructive custody is a common law concept and there are no common law crimes against the United States. While we agree that there are no common law offenses against the United States, Jerome v. United States, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943); United States v. Pardee, 368 F.2d 368, 374 (4 Cir. 1966), the offense with which appellants were charged and of which they were convicted in counts one and two is not a common law offense but a statutory offense, under 18 U.S.C. § 549. Where a federal criminal statute uses a common law term without otherwise defining it, the general practice is to give that term its common law meaning. United States v. Turley, 352 U.S. 407, 411, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957); United States v. Pardee, 368 F.2d 368, 374 (4 Cir. 1966), *supra.* Common law has long recognized the concept of constructive custody and it is not unreasonable to adopt this concept in construing the statutory meaning of "customs custody" as used in 18 U.S.C. § 549.

▮▮ We now turn our attention to the appellants' contention that even if the Customs Service did have custody of the whiskey such custody was terminated upon the payment of the estimated duties on the day before the commission of the alleged offenses. Upon an examination of pertinent statutes, case law, regulations, and the testimony of customs personnel in the record, we find this contention to be without merit. 19 U.S.C. § 1499, *supra,* clearly states that imported merchandise shall not be delivered from customs custody until it has been inspected, examined or appraised and has been certified by a customs inspector to have been properly invoiced. Likewise

by regulation, 19 C.F.R. § 8.29(b),[5] it is provided that merchandise designated for examination may be released only after examination has been completed and a collector has designated an appraising officer to effect the release of merchandise. Thus, by statute, merchandise imported into the United States is not to be released from customs custody until it has been inspected and found to be correctly invoiced and found to comply with the laws of the United States. This conclusion was upheld in United States v. Mussman and Shafer, Inc., 40 CCPA (Customs) 108 (1953), as it was there held that a delivery permit issued upon the filing of the consumption entry and the payment of estimated duties did not pass unconditional control of the goods from customs custody to the importer. Testimony of customs personnel in the record clearly shows that the whiskey could not have been released to the control of the consignee until the final inspection had been completed. The evidence is clear that the estimated duties were paid on February 26, that the alleged offenses occurred during the very early morning hours of February 27, but that the final inspection necessary to a release of the whiskey from customs custody was not made until later in the day (after 8:00 a. m.) on February 27. It follows that, at the time of the alleged offenses, the whiskey was still in customs custody.

Appellants cite the early Supreme Court decision in Conard v. Pacific Ins. Co., 31 U.S. 262, 281, 6 Peters 262, 281, 8 L.Ed. 392 (1832), as supporting their claim that customs custody is terminated by the payment of estimated duties. It is true that this case, at first glance, would seem to support appellants' contention but examination discloses that at the time this case was decided there was no federal statute providing for inspection and certification of imported merchandise prior to its release from customs custody. The first such statute providing for inspection and certification prior to the release of goods from customs custody was enacted in 1922,[6] many years after the *Conard* decision. Thus, *Conard* is clearly inapposite.

In sum, for the reasons herein stated, we reject appellants' challenge to the court's jurisdiction as to counts one and two.

 Finally, we are of the opinion that there is ample evidence in the record to support the convictions of the appellants on count three.

Affirmed.

---

5. 19 C.F.R. § 8.29(b)

Merchandise designated for examination may be released after examination has been completed if it has been found to be truly and correctly invoiced, is entitled to admission into the commerce of the United States, and its release is not precluded by any law or regulation. The collector may designate an appraising officer to effect the release of examined packages * * *.

6. The 1922 statute is virtually the same as the present 19 U.S.C. § 1499, which has been discussed earlier. The statute was first enacted in Act Sept. 21, 1922, c. 356, Title IV, § 499, 42 Stat. 965. The identical language was reenacted in the Tariff Act of 1930 as Act June 17, 1930, c. 497, Title IV, § 499, 46 Stat. 728. The Tariff Act of 1930 was amended in 1938 with a few minor changes, irrelevant here, in this provision as appear in Act June 25, 1938, c. 679, §§ 15, 16(a), 52 Stat. 1084.