UNITED STATES of America,

v.

GARBER, Marvin, Appellant.

UNITED STATES of America,

v.

DENUCCI, Nicholas, Appellant.

Nos. 79–2511, 79–2517.

United States Court of Appeals,
Third Circuit.

Argued May 22, 1980.

Decided July 25, 1980.

Joseph N. Bongiovanni, III (argued), Bongiovanni & Reagoso, Philadelphia, Pa., for appellant Garber.

Alfonso Tumini (argued), Davidson, Aaron & Tumini, Philadelphia, Pa., for appellant Denucci.

Luther E. Weaver, III (argued), Asst. U. S. Atty., Philadelphia, Pa., for appellee; Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, App. Section, Lynell N. Staton, Asst. U. S. Atty., Philadelphia, Pa., on the brief.

Before ADAMS, VAN DUSEN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

Defendants Marvin Garber and Nicholas Denucci were charged in a four-count indictment with various offenses arising out of the theft of copper cathodes from the Northern Metal Company (Northern Metal) pier in Philadelphia, Pennsylvania, in March 1978. Count I charged that Garber and Denucci stole from Northern Metal's storage facility eight copper cathodes which were part of an interstate or foreign shipment of freight in violation of 18 U.S.C. § 659 (1976). Count II charged that they unlawfully had the same copper cathodes in their possession in violation of 18 U.S.C. § 659 (1976). Count III charged that they unlawfully removed copper cathodes from customs custody and control in violation of 18 U.S.C. § 549 (1976). Count IV charged that they conspired with each other to violate §§ 659 and 549 in violation of 18 U.S.C. § 371 (1976). After a lengthy trial, a jury found both Garber and Denucci guilty on all four counts. The district court sentenced each defendant to concurrent one-year terms of imprisonment on Counts I, II and III, and to a subsequent five-year term of probation on Count IV. The defendants were also ordered to make restitution. Garber and Denucci filed timely appeals, based on several legal claims. After considering each contention raised by the defendants, we affirm the § 659 conviction of theft from foreign commerce (Count I), reverse the conviction of receipt and possession of goods stolen from a foreign shipment (Count II), reverse the conviction of removal of goods from customs custody and control (Count III), and affirm the conviction of conspiracy (Count IV).

### I.

Cerro Sales Corporation (Cerro) represents the country of Chile in the sale of Chilean copper in the United States. Each year Cerro sells about 70,000 tons of Chilean copper to various corporations in the United States. In 1978 one of Cerro's long-term contracts required it to sell 1200 tons of copper cathodes[1] per month to Anaconda American Brass Company (Anaconda). One of the monthly shipments of copper consigned to Anaconda was enroute from Chile to Bridgeport, Connecticut, in February 1978 when the steamship company carrying the copper experienced labor problems at several locations, including Bridgeport. Under the ocean bills of lading, the steamship company had the right to divert the cargo to other ports. In this instance the steamship company chose to discharge the cargo in Philadelphia. Cerro found that the freight costs for shipping the copper from Philadelphia to Connecticut were prohibitive, making delivery to Bridgeport impracticable. Cerro was thus forced to try to find other buyers for the copper. In the interim the copper cathodes remained at the Northern Metal pier, where the cargo had arrived on February 22, 1978.

In the fourth week of March 1978, a number of cathodes disappeared during the night from the warehouse at Northern Metal's pier. During that week, Garber and Denucci, while on duty as Philadelphia police officers, drove their patrol cars onto the pier on several nights and parked next to the area where the copper was stored. At these times Garber was away from his assigned police district. Garber and Denucci always left the pier at the same time, approximately 20 to 30 minutes after they had arrived. Subsequent investigations revealed that traces of copper were found in the trunks of both defendants' patrol cars and on their police uniforms.

1. Copper cathodes are large sheets, weighing approximately 300 pounds each. To facilitate shipping and handling, 14 sheets are bound together in a bundle.

## II.

The defendants first challenge their conviction under § 659, asserting that the copper cathodes were not part of foreign or interstate commerce when they were stolen. They argue that the foreign shipment had come to an end when the cargo was unloaded in Philadelphia.

■ Without question, a conviction under § 659 can only be sustained if there is evidence that the stolen items were goods "moving as or which are a part of or which constitute an interstate or foreign shipment of freight."[2] There is no requirement of literal movement; goods which are part of or constitute an interstate or foreign shipment are covered by the statute even if not in motion at the time of the theft. *United States v. Gollin*, 176 F.2d 889, 893 (3d Cir.), *cert. denied sub nom. Richman v. United States*, 338 U.S. 848, 70 S.Ct. 89, 94 L.Ed. 519 (1949); *United States v. Wills*, 593 F.2d 285 (7th Cir.), *cert. denied*, 441 U.S. 964, 99 S.Ct. 2413, 60 L.Ed.2d 1070 (1979); *United States v. Williams*, 559 F.2d 1243 (4th Cir. 1977); *United States v. Astolas*, 487 F.2d 275, 279 (2d Cir. 1973), *cert denied sub nom. Edin v. United States*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). The test for determining whether goods are part of an interstate or foreign shipment is a practical one based on common sense and administered on an ad hoc basis. *United States v. Astolas*, 487 F.2d at 279. In order to make this determination, courts look to a variety of factors, such as the relationship between the consignee, consignor, and carrier; the indicia of interstate or foreign commerce at the time of the theft; and the preservation of the congressional intent in enacting this statute. *United States v. Gimelstob*, 475 F.2d 157, 164 (3d Cir.), *cert. denied*, 414 U.S. 828, 94 S.Ct. 49, 38 L.Ed.2d 62 (1973); *United States v. Gates*, 528 F.2d 1045, 1047 (5th Cir.), *cert. denied*, 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 101 (1976); *United States v. Cousins*, 427 F.2d 382, 385 (9th Cir. 1970); *United States v. Astolas*, 487 F.2d at 279. The delivery of goods to a carrier before the theft occurred, if applicable, and the physical location of the shipment when stolen are important considerations, *United States v. Astolas*, 487 F.2d at 279, but no one factor is conclusive. *United States v. Parent*, 484 F.2d 726, 729 (7th Cir. 1973), *cert. denied*, 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974). Rather, each case must be evaluated on its own particular facts, *United States v. Gimelstob*, 475 F.2d at 164, recognizing that § 659 was designed to promote the flow of goods in interstate and foreign commerce, and that "the carrying out of this purpose is not to be hampered by technical legal conceptions." *United States v. Waroneck*, 582 F.2d 1158 (7th Cir. 1978), quoting *United States v. Astolas*, 487 F.2d at 279.

■ Both parties agree that the copper cathodes involved in this case constituted a foreign shipment at least until the ship docked in Philadelphia. They also agree that a foreign or interstate shipment does not lose its characteristic as such "until it

---

2. 18 U.S.C. § 659 provides in pertinent part:

"*Whoever embezzles, steals, or unlawfully takes, carries away or conceals, or by fraud or . deception obtains* from any pipeline system. railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility *with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight*, express, or other property; or

\* \* \* \* \* \*

"Whoever embezzles, steals, or unlawfully takes by any fraudulent device, scheme, or

game, from any railroad car, bus, vehicle, steamboat, vessel, or aircraft operated by any common carrier moving in interstate or foreign commerce or from any passenger thereon any money, baggage, goods, or chattels, *or whoever buys, receives, or has in his possession any such money, baggage, goods, or chattels, knowing the same to have been embezzled or stolen—*

"Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both." (Emphasis supplied.)

arrives at its final destination and is there delivered." *United States v. Yoppolo*, 435 F.2d 625, 626 (6th Cir. 1970). Garber and Denucci contend, however, that once the shipment of copper was diverted to Philadelphia and it became clear that the copper cathodes could not be delivered to their original destination in Connecticut, Philadelphia became the final destination of that particular shipment. The Government, on the other hand, argues that Philadelphia was only a temporary stop, occasioned by an unforeseen change in route by the shipping company.[3] The Government emphasizes that the evidence demonstrated that Cerro did not seek to have the copper delivered to Philadelphia, did not intend to keep it there, intended to sell all the copper cathodes it imported, and at the time of the theft was seeking another party to replace Anaconda as purchaser of that specific lot of copper. We believe that a common sense view of the facts in this case requires us to agree with the Government's position. Although, at the time of the theft, Cerro did not have another specific purchaser in mind, there was uncontradicted evidence that Cerro had no use for the copper cathodes at its dock in Philadelphia, and was attempting to sell the shipment to companies located elsewhere.

Despite this evidence, the defendants vigorously assert that Philadelphia must be viewed as the final destination of the copper. Their primary argument is that the cathodes remained in Philadelphia for such an extended period of time that the shipment could not have been considered temporarily delayed. The cases explicitly hold that in determining whether interstate or foreign commerce is involved under § 659, the crucial time is the time of the theft. *United States v. Gollin*, 166 F.2d 123 (3d Cir.), *cert. denied*, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151 (1948); *United States v. Tyers*, 487 F.2d 828 (2d Cir. 1973); *cert. denied*, 416 U.S. 971, 94 S.Ct. 1995, 40 L.Ed.2d 560 (1974); *Winer v. United States*, 228 F.2d 944 (6th Cir.), *cert. denied*, 351 U.S. 906, 76 S.Ct. 695, 100 L.Ed. 1442 (1956); *United States v. Hardaway*, 455 F.Supp. 226 (N.D.Ill.1978), *aff'd*, 593 F.2d 285 (7th Cir.), *cert. denied, Wills v. United States*, 441 U.S. 964, 99 S.Ct. 2413, 60 L.Ed.2d 1070 (1979). Delays enroute do not deprive shipments of continued characterization as interstate or foreign so long as the goods have not yet reached their destination, *United States v. Augello*, 452 F.2d 1135, 1141 (2d Cir. 1971), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1972), and the shipper or carrier intends to resume the journey. *United States v. Maddox*, 394 F.2d 297 (4th Cir. 1968).

In the instant case, at the time the thefts began, the copper had been in Philadelphia for 28 days.[4] The defendants argue that this demonstrates that there was more than a brief delay in the journey.[5] Under the circumstances present in this instance, we do not perceive 28 days to be such an extended length of time that it necessarily

---

**3.** Jurisdiction under 18 U.S.C. § 659 (1976) can be based on shipments which are either interstate or foreign. Both parties characterize the shipment in question as foreign. The key fact is that it originated in Chile and terminated in the United States. Since the alleged jurisdictional basis is provided by the journey from outside the United States, whether it crosses state lines once it arrives in the United States is irrelevant so long as the cargo from the foreign port has not yet reached its final destination. Thus, if a shipment of goods from Chile to Pittsburgh is shipped via Philadelphia and hijacked on the leg of the journey from Philadelphia to Pittsburgh a theft from a foreign shipment has occurred. Under the Government's theory, the copper was stolen during a temporary delay in the trip moving the copper from Chile. Whether this copper was destined for Pennsylvania or some other state was inconsequential. The crucial point is that Cerro did not intend the journey from Chile to end at the Philadelphia waterfront.

**4.** The copper arrived February 22, 1978; the thefts apparently began the night of March 22, 1978.

**5.** The defendants emphasize that the copper cathodes were still in Philadelphia six months later at the time of the trial. This fact is deprived of its apparent relevance, however, by the defendants' concession that the time of the theft is the critical time for determining whether a shipment is foreign or interstate, and by the *absence of any indication that Cerro had* ceased its active pursuit of other purchasers.

converts a temporary destination into a final one. In *United States v. Augello*, 452 F.2d 1135 (2d Cir. 1971), a shipment first entered the United States when it arrived at the docks in New York. Its final destination was a warehouse located elsewhere within the state of New York. It was stolen 11 days after arrival while enroute to the warehouse. The court held that this shipment, though somewhat delayed, was still in foreign commerce at the time of the hijacking.[6] Moreover, *United States v. Maddox*, 394 F.2d 297 (4th Cir. 1968), upon which Garber and Denucci rely, is not to the contrary. In *Maddox*, a sugar broker regularly purchased large quantities of sugar from Puerto Rico. The sugar was shipped to Baltimore and stored temporarily in a warehouse. Maddox stole bags of sugar from the warehouse over a three-month period. The court upheld his conviction under § 659, despite Maddox's claim that the sugar in the warehouse had lost its character as foreign or interstate commerce. The court stated:

> "The deposit of cargo in a warehouse may under certain circumstances constitute a coming to rest, marking the termination of an interstate or foreign shipment. At other times, however, the stop-off at the warehouse may be only a pause in the course of an uncompleted journey. Standing alone, the removal of goods to a warehouse is not conclusive; nor is the consignee's power to divert the goods from the intended interstate commerce. See *Champlain Realty Company v. Town of Brattleboro*, 260 U.S. 366, 43 S.Ct. 146, 67 L.Ed. 309 (1922). These are merely factors to be considered, but there is no rigid rule of law that mandates a holding either way. The answer in any particular case must depend on a factual assessment."

**6.** The intended route for the shipment from the dock to the warehouse was intrastate. The court viewed the situation as an uncompleted foreign journey, and based its jurisdiction solely on the fact that the goods were still in foreign commerce at the time of the theft. *United States v. Augello*, 452 F.2d 1135, 1141 (2d Cir. 1971).

**7.** We emphasize once again that at the trial there was undisputed evidence that Cerro con-

"... There is no absolute requirement that the flow of commerce be continuous if there is the clear intention to resume after a brief pause."

*Id.* at 299–300. After reviewing the record, the court concluded that the sugar was part of a "continuing, though interrupted, shipment in commerce." *Id.* at 300. Garber and Denucci seize on the statement in *Maddox* that the flow of commerce may be interrupted so long as there is the intention to resume the journey after a brief pause. The linchpin of their argument is that 28 days cannot be considered a brief pause. Our reading of *Maddox* does not lead to such an inelastic definition of "brief pause." First, we point out that *Maddox* is silent as to the length of time the sugar had been in the warehouse at the time of the theft. Second, we note the *Maddox* court's remonstration that there are no rigid rules in determining whether goods have come to rest, and that ad hoc decisions must be made based on the particular facts of each case. In light of these considerations, we conclude that the 28 days the copper cathodes were in Philadelphia before the time of the theft did not in themselves deprive the shipment of its foreign character.[7]

Furthermore, in a slightly different context courts have often ruled that a substantial delay in one state does not necessarily cause an item to lose its interstate character. For example, to support a conviction under 18 U.S.C. § 2313 (1976), which outlaws the sale or receipt of stolen vehicles, the Government must show that at the time of the crime the vehicle in question was moving in the "stream of interstate or foreign commerce" and had not yet come to rest within a state. *United States v. His-*

tinued its active pursuit of purchasers for the copper throughout this period. While it may be that in other circumstances, e. g., if the seller made no attempt to seek other buyers or if the shipment consisted of a non-fungible commodity without a steady market, a period of 28 days might be seen as evidence of something other than a temporary pause, we do not have such a case before us.

cott, 586 F.2d 1271, 1274 (8th Cir. 1978). In *United States v. Baker*, 452 F.2d 21 (5th Cir. 1971), *cert. denied*, 405 U.S. 974, 92 S.Ct. 1195, 31 L.Ed.2d 248 (1972), a truck was stolen and transported across state lines to its destination state. It remained there for three months and was used personally during that time by a dealer in stolen goods. He "revealed no intention of keeping it," however, and sold it to Baker. *Id.* at 24. The court upheld Baker's conviction under § 2313, stating:

> "Admittedly, [the dealer] had the vehicle in his possession for three months. Time, however, is not conclusive but rather one of the facts to be considered in determining whether a vehicle is in interstate commerce. We cannot say, as a matter of law, that the vehicle in this case lost its interstate character."

*Id.* Similarly, in *United States v. Tobin*, 576 F.2d 687 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978), the defendants attacked as invalid their convictions under 18 U.S.C. § 2315 (1976) for receiving and selling stolen property which was moving in interstate or foreign commerce by emphasizing that two years had elapsed since the stolen items had crossed state lines and entered the destination state. They argued that this definitively proved that the stolen items had come to rest and thus had lost their interstate character. The court ruled that simply because goods reach the state where they are intended to be sold does not deprive the goods of their interstate character. *Id.* at 692. Rather, so long as the transfer of goods can be considered a continuation of the movement that began outside the state, the interstate commerce jurisdictional requirement is fulfilled. *Id.* Additionally, long delays do not necessitate a finding that items left interstate commerce. Specifically, the *Tobin* court held

that the two years which had elapsed between the time the items entered the destination state and the time of the attempted sale did not require a finding that the items had come to rest before the sale.

In light of the cases interpreting § 659 and similar jurisdictional provisions in §§ 2313 and 2315, we conclude that in this case the 28 days between arrival of the copper in the United States and the theft do not require that the shipment be viewed as one which had lost its foreign character.

Garber and Denucci base their secondary attack on the jurisdictional prerequisite for § 659 on the fact that at the time of the theft Cerro had no specific purchaser of the copper in mind. They acknowledge that Cerro presented uncontradicted testimony that it could not use the copper cathodes itself in Philadelphia and was trying to locate buyers for the copper. Nevertheless, Garber and Denucci reiterate that unless there is a clear intention to resume, storage at a warehouse constitutes the termination of a foreign or interstate shipment. They further assert that in order for there to be sufficient intent to resume the journey, there must be a specific ultimate destination in mind. We are not persuaded by this argument. Although generally shippers will have a specific final destination in mind, there are instances—and this case is one of them—when this will not be so.[8]

Case law provides us with other telling examples. *United States v. Gates*, 528 F.2d 1045 (5th Cir.), *cert. denied*, 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (1976), presents a factual situation quite similar to the one at hand. In *Gates*, a carton was shipped from New York to Georgia for delivery to the consignee in Atlanta. The consignee, however, refused to accept delivery. The carton was stolen in Atlanta while the truck was enroute to the local terminal. The

8. Defendants' insistence that in order to characterize a shipment as one involved in an ongoing journey, rather than as one which has come to its final destination, the seller must in every instance have a specific purchaser in mind is too inflexible. It would lead to such anomalous results as sustaining a conviction under § 659 if goods were stolen from a pier so long as the shipper thought that the consignee intended to come pick up the shipment, but reversing a conviction under § 659 if the same goods were stolen one hour after the consignee had just cancelled the contract and refused to pick up the shipment, suddenly leaving the shipper without a consignee.

defendant attacked his conviction under § 659, asserting that the goods were in local transit at the time of the theft. The Fifth Circuit sustained the conviction, stating that the fact that the consignee had refused delivery did not mean the goods lost their interstate character.

"There is no need to employ complex fictions about legal title to arrive at an artificial result. The facts of this case strongly indicate that the stolen goods were part of a continuing interstate shipment. Final delivery was never effected. In fact, the goods were stolen before they were ever removed from the truck by an employee of the carrier. That Baron's initially rejected the shipment is not controlling. The carton retained its interstate character despite the aborted delivery and the fact that were it not for the theft, the carrier would have been forced to make arrangements to dispose of the shipment, presumably at the direction of the consignor.

*Id.* at 1047–48. In *United States v. Maddox*, 394 F.2d at 299, discussed above at pages 1148–1149, the Fourth Circuit affirmed a conviction under § 659 for theft of sugar from a warehouse. A sugar broker regularly imported large quantities of sugar from Puerto Rico. It arrived in the United States at Baltimore, where regular customers picked up 40% to 60% of each shipment directly from the pier. The rest of the sugar was stored temporarily in a warehouse in Baltimore. Approximately 70% of the warehoused sugar was held to meet pre-existing contracts with buyers in surrounding states. The defendant stressed that the sugar stolen from the warehouse was no longer in foreign commerce since the individual bags were not earmarked for any particular buyer, the sugar broker could do with the sugar as he saw fit, and a

significant portion of the sugar had not yet been sold. Despite these facts, the court held that an assessment of all the circumstances of the case indicated that the sugar had not left interstate commerce. In *United States v. Thomas*, 396 F.2d 310 (2d Cir. 1968), 67 cartons arrived in New York from Japan pursuant to the order of an importer located in New York City. Seven days later a trucking company, acting as agent for the importer, removed the cartons from the pier and took them to the trucking company's warehouse. That same day two cartons were stolen. The cartons were not earmarked for specific buyers. At the time of the theft, the importer had received orders for 56 cartons. The remaining 11 were to be held at the importer's New York warehouse pending further orders. Under these facts, even though it was unclear whether the two cartons stolen were those for which orders had been received or not, the court sustained convictions for violating § 659.[9]

In the case at bar there was, in effect, an aborted delivery to Anaconda. Cerro was, therefore, forced to make other arrangements to dispose of the shipment. The fact that these arrangements had not been made at the time of the theft, when coupled with the fact that Cerro was unexpectedly faced with the arrival of a shipment of approximately 500 tons[10] of copper cathodes in a port with no purchasers situated nearby, does not, in our view, deprive the shipment in question of its foreign character.

■ To summarize, taking a common sense approach to the realities of this situation, we do not believe that the unforeseen delivery to Philadelphia, with the consequent cancellation of the agreement that this particular shipment would go to Anaconda in Connecticut, thus necessitating

9. The court in *United States v. Thomas*, 396 F.2d 310 (2d Cir. 1968), emphasized the fact that many of the cartons were ultimately destined for delivery out of state. Nonetheless, in light of the fact that the journey originated in Japan and was continuing, though it had been temporarily interrupted in the United States, the court affirmed the trial court's finding that

"the cartons were 'in interstate or foreign commerce' when they were [stolen]." *Id.* at 315.

10. There was testimony that the shipment of copper consisted of 3,262 cathodes. App. at 124a. Each cathode weighs approximately 300 pounds. *Id.* Therefore, the total shipment of copper weighed approximately 978,600 pounds, or nearly 500 tons.

that Cerro attempt to find alternative purchasers for the copper, deprived this shipment of its foreign character. Nor do we think that the fact that at the time of the theft Cerro had been unsuccessful for the previous 28 days in locating buyers for the cathodes requires a finding that the shipment had come to rest at its final destination. Rather, we are persuaded that, in the circumstances of this case, Cerro's active pursuit of alternative purchasers demonstrates Cerro's intent to resume the shipment as soon as possible. This intent is dispositive and supports the conclusion that, at the time of the theft, the shipment of copper cathodes had not reached its final destination and had not lost its foreign commerce character. Because we conclude that the defendants' challenge to the jurisdictional basis of their convictions for violating § 659 fails, we affirm the judgment of conviction of Count I.

### III.

The defendants also challenge their conviction for possession of stolen goods under § 659.[11] Garber and Denucci assert that they could not properly be convicted of both theft from an interstate shipment and possession of goods stolen from an interstate shipment when the same goods were at issue in both charges. We agree with their argument insofar as it attacks the sentences for possession of stolen goods under § 659. A review of the recent cases reveals that courts have carefully examined this and similar statutes to determine the congressional intent in punishing multiple aspects of the same criminal act. The Supreme Court in *Heflin v. United States*, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959), was faced with a defendant who had multiple convictions under 18 U.S.C. § 2113 (1976) arising from one bank robbery. The defendant was convicted of violating § 2113(d) in unlawfully taking the funds and of violating § 2113(c) in unlawfully possessing the same funds. The Court, stating that "we resolve an ambiguity in favor of lenity when required to determine the intent of Congress in punishing multiple aspects of the same criminal act," *id.* at 419, 79 S.Ct. at 453, held that subsection (c) was designed to reach a new group of wrongdoers, those who only received the money from the robbers, not to increase the punishment of those who actually robbed the bank. Therefore, only one conviction was allowed to stand. A similar situation presented itself in *United States v. Gaddis*, 424 U.S. 544, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976). The defendants had been convicted of robbing a bank and of possessing the funds stolen in the robbery. The appellate court held that it was plain error to allow the jury to convict an individual both of taking and of possessing the money obtained in one robbery, reversed the judgments of conviction, and ordered a new trial. The Supreme Court agreed that the defendants could not be convicted of both counts, ruling that the trial judge should have instructed the jury to consider, first, the theft charge, and only consider the possession charge if they found insufficient proof that the defendants actually participated in the robbery. The Court, however, disagreed that a new trial was necessary, and held that the error could be fully corrected by simply vacating the conviction and sentence under the possession count. *Id.* at 549, 552, 96 S.Ct. at 1026, 1028.

The Sixth Circuit adopted this approach in reviewing multiple convictions under § 659 in an opinion by our colleague, Judge Adams, sitting with the U.S. Court of Appeals for the Sixth Circuit. *United States v. Solimine*, 536 F.2d 703 (6th Cir.), *vacated on other grounds*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), *cert. denied sub nom. Sclafani v. United States*, 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 596 (1977). Finding "no indication in the sparse legislative history of section 659 that Congress intended to regard each theft from interstate shipment as a multiplicity of discreet offenses so that the punishment for such theft could be enhanced," *id.* at 710, the court concluded that the section of the statute outlawing possession of goods stolen from an inter-

---

11. The text of the pertinent provisions of § 659 appears at note 2, *supra*.

state or foreign shipment was an attempt to bring within the scope of the criminal law a different class of wrongdoers from the actual participants in the theft. Holding that convictions of theft from interstate shipment and of receipt and possession of the same property could not both stand, the court vacated the conviction and sentence with respect to the possession count. *Id.* at 711. In *United States v. Gilbert*, 553 F.2d 990 (5th Cir. 1977), the Fifth Circuit explicitly followed *Solimine* and held that under § 659 the defendant could not properly be convicted of both theft from interstate freight shipments and possession of the proceeds of the theft. Even more recently, the Second Circuit has taken a similar approach. In *United States v. DiGeronimo*, 598 F.2d 746 (2d Cir.), *cert. denied*, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979), the court held that the defendants' convictions of interference with interstate commerce by means of robbery in violation of 18 U.S.C. § 1957 (1976) and of knowing receipt and possession of goods stolen from interstate commerce in violation of 18 U.S.C. § 659 were improper. Acknowledging that convictions under two different statutes were involved, unlike the situations presented by *Heflin, Gaddis*, and *Solimine*, the court nonetheless ruled that the convictions were multiplicious. It viewed the charge of theft under § 1951 as the functional equivalent of a charge under the theft provisions of § 659. Finding no support in the legislative history of either statute for the proposition that Congress wanted to "punish separately and cumulatively the crimes of robbing a truck of its contents and receiving the sto-

len goods," *id.* at 751, the court vacated the conviction and sentence with respect to the possession count.[12] *See Busic v. United States*, —— U.S. ——, ——, 100 S.Ct. 1747, 1753–1754, 64 L.Ed.2d 381 (1980), citing *Simpson v. United States*, 435 U.S 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978).

■ This review of the decisional law convinces us that the convictions of Garber and Denucci under § 659 for both theft from a foreign shipment and receipt and possession of goods stolen from a foreign shipment are multiplicious. Since the jury's verdict indicates that it made factual findings that both defendants participated in the theft and then kept the proceeds, we may conclude that a properly instructed jury would have stopped after making the first finding (see discussion of *Gaddis* at page 1152 above). Therefore, the proper remedy is to vacate the conviction and sentence with respect to the possession count. *Id.* at 711. Accordingly, we must vacate the judgments of conviction and the sentences imposed on Garber and Denucci under Count II.

## IV.

Garber and Denucci appeal, in addition, from their conviction of removing goods from customs custody in violation of § 549. They argue that the copper cathodes were not in customs custody in March 1978 when they were stolen. The Government, acknowledging that the copper was located at the pier outside the north end of the Northern Metal warehouse and not in a facility

12. Our decision in *United States v. Gomez*, 593 F.2d 210 (3d Cir. 1979) (en banc), is not to the contrary. In *Gomez* the defendant was convicted of two offenses under 21 U.S.C. § 841(a)(1) (1976): distribution of cocaine and possession with intent to distribute cocaine. The court affirmed both of the convictions, but vacated the sentences in order "to effectuate the congressional intent to prevent sentence pyramiding, and to avoid the anomalies of a technical application of the merger theory." *Id.* at 217. *Gomez* explicitly noted that the Supreme Court held in *United States v. Gaddis*, 424 U.S. 544, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976), that under that federal bank robbery statute, 18 U.S.C. § 2113 (1976), "a jury should

be instructed that it can convict a defendant for either robbery or receiving, but not for both." 593 F.2d at 217 n. 20. This principle applies to the instant case where the defendants were convicted of theft from a shipment in interstate or foreign commerce and of possession of goods stolen from interstate or foreign commerce. *Gomez*, which arises out of a different statute concerning drug transactions, as opposed to theft, is factually distinguishable from the case at hand. In *United States v. Dowling*, (1980, 3d Cir. Nos. 79–2130/31 & 80–1444/45), this court vacated in certain situations only the sentences, as opposed to the convictions.

operated by the Customs Service, contends that the cathodes were in constructive customs custody in March 1978. Section 549 provides in pertinent part:

"Whoever, maliciously enters any bonded warehouse or any vessel or vehicle laden with or containing bonded merchandise with intent unlawfully to remove therefrom any merchandise or baggage therein, or *unlawfully removes any merchandise* or baggage in such vessel, vehicle, or bonded warehouse or *otherwise in customs custody or control*

　　　*　　*　　*　　*　　*　　*

[s]hall be fined not more than $5,000 or imprisoned not more than two years, or both." (Emphasis supplied.)

Courts which have interpreted this statute have held that goods imported into this country are in constructive customs custody from the moment of their arrival in the United States until their release by the Customs Service, regardless of whether the Customs Service has actual physical possession. *United States v. Harold*, 588 F.2d 1136, 1142 (5th Cir. 1979); *Mungo v. United States*, 423 F.2d 1351, 1354 (4th Cir. 1970).

In the instant case the copper had recently arrived in the United States from Chile. Constructive customs custody had thereby been established. The dispute centers on whether four weeks after arrival the Customs Service had released the shipment, thus extinguishing customs custody. An examination of the record before us reveals that the cargo arrived in Philadelphia on February 22, 1978. The copper in question was accepted by Northern Metal on February 25.[13] At the time of unloading, the steamship company counted the copper bundles in the cargo. When Northern Metal took delivery from the ship, it transferred the bundle count onto a warehouse certificate, which it forwarded to Cerro.[14] A bond for immediate delivery had already been posted under which the Customs Service could release goods prior to the payment of the exact amount of the duty.[15]

As noted earlier, this shipment was originally consigned to Anaconda in Bridgeport, Connecticut, but was discharged in Philadelphia because it had unexpectedly been rerouted by the steamship company. At the time it was unloaded in Philadelphia, a substitute consignee had not yet been located. The Government relies on this fact, contending that goods are released from customs custody only when the consignee accepts delivery from the shipper. Unfortunately, the Government provides us with no statutory or decisional authority for this contention.[16] Therefore, we have found it necessary to review the statutory scheme regulating imported goods.

The Tariff Act of 1930, 19 U.S.C. §§ 1303–1677g (1976), sets forth an orderly procedure for ascertaining and collecting duties. A portion of the Act, § 1499, while not phrased in terms of "release," appears to refer to the concept involved. It provides in part:

"Imported merchandise, required by law or regulations made in pursuance thereof to be inspected, examined, or appraised, *shall not be delivered from customs custody, except under such bond* or other security as may be prescribed by

---

**13.** Government Exhibit 6, introduced at trial, documents this fact.

**14.** App. at 147a.

**15.** App. at 178a–182a; App. at 143a.

**16.** The Government asserts that goods are released from customs custody when they are "permitted," or authorized to be delivered to the next consignee, but cites no support for this assertion. It does not point to a single statute or case involving customs custody in which the word "permitted" is used. The Government turns to 19 C.F.R. § 158.1 to locate the definition of "permitted." Unfortunately, this regulation sheds no light on this issue. It concerns relief from duties paid on lost, damaged, abandoned, or exported merchandise, see 19 C.F.R. § 158.0 (1979), a different problem from the one at hand. While it defines "permitted," it does so solely for the purpose of Subpart A, that portion of the regulation regarding lost or missing packages and deficiencies in contents of packages. It is silent as to the genesis of the term "permitted." Furthermore, although there is reference to theft while in customs custody in Subpart C, the word "permitted" never appears in that subpart.

the Secretary of the Treasury to assure compliance with all applicable laws, regulations, and instructions which the Secretary of the Treasury or the Customs Service is authorized to enforce *until it has been inspected, examined, or appraised and is reported by the appropriate customs officer to have been truly and correctly invoiced and found to comply with the requirements of the laws of the United States.*" (Emphasis supplied)

From this statute we conclude that, generally, customs custody of imported goods continues until the merchandise has been inspected, found to be correctly invoiced, and found to otherwise comply with the laws of the United States. *See Mungo v. United States*, 423 F.2d at 1357. Further, once the inspection and the requisite findings have been made—or, if a proper bond is filed, before the statutory duties are carried out—the goods can be released from customs custody.[17]

 Applying these principles to the facts presented by this record, we conclude that the copper cathodes had been released from customs custody at the time of the theft. We emphasize that a sufficient immediate delivery bond had been posted, that Northern Metal had accepted delivery from the ship and had transferred the ship's bundle count to its warehouse certificate, that 28 days had elapsed since the cargo had arrived in the United States, and that there was no representation by the Government

that the Customs Service intended to make any further inspection, examination, or appraisal of the shipment. In view of these circumstances, we believe that the fact that a specific consignee had not yet been named is insignificant. Although, in the usual case, a shipment unloaded at the dock would be earmarked for a particular consignee and that shipment would be released directly to the consignee or its agent after a short time on the pier, this is not the usual case. The unintended delay of the instant shipment while Cerro sought an alternative purchaser did not increase the governmental interest in the goods. In the absence of any indication that the Customs Service intended to make any further examination or appraisal of the shipment, we hold that in this case the goods had been released from constructive customs custody at the time of the theft.

We note that the cases we have reviewed on this issue are not to the contrary. In *United States v. Harold*, 588 F.2d at 1136–37, the defendant was employed as a dock foreman. On the very day the cargo was being offloaded, he removed five cartons from the ship's cargo containers and attempted to place them into his car, rather than into the warehouse where they were to be stored. The court upheld his conviction under § 549, emphasizing that there had not even been a chance for the Customs Service to inspect the goods or authorize them for delivery. In *Mungo v. United States*, 423

---

**17.** Another portion of the Act also addresses the issue of release from customs custody. Section 1484(j) provides in part:

"(j) Merchandise shall be released from customs custody only to or upon the order of the carrier by whom the merchandise is brought to the port at which entry is made, except that merchandise in a bonded warehouse shall be released from customs custody only to or upon the order of the proprietor of the warehouse. The customs officer shall not be liable to any person in respect of the delivery of merchandise released from customs custody in accordance with the provisions of this section. Where a recovery is had in any suit or proceeding against a customs officer on account of the release of merchandise from customs custody, in the performance of his official duty, and the court certifies that there was probable cause for such release by such

customs officer, or that he acted under the directions of the Secretary of the Treasury, or other proper officer of the Government, no execution shall issue against such customs officer, but the amount so recovered shall, upon final judgment, be paid out of moneys appropriated from the Treasury for that purpose."

Although a literal reading of this section might indicate that a prerequisite to release is an order from the carrier, we believe that this section is not controlling in the case before us. This provision appears to concern the liability of the Customs Service in a bailment situation when actual custody and control is involved. We are confronted with an instance of constructive, not actual, custody. We find § 1484(j) unhelpful in illuminating when release from constructive customs custody occurs.

F.2d at 1352–53, a ship had arrived carrying a container of imported Scotch whiskey. The container was unloaded from the ship and placed on a flatbed trailer parked next to the warehouse at the dock. Four or five days later, the defendants were apprehended removing cases of whiskey from the container. In sustaining the § 549 conviction, the court stated that the final inspection before release of the whiskey from customs custody had been scheduled but had not yet taken place at the time of the theft.[18] The short length of time which had passed since the ships in *Harold* and *Mungo* had arrived and the fact that there were specific customs inspections yet to be performed distinguish these cases from the one at bar.

Therefore, guided by the principle that criminal statutes should be strictly construed, we conclude that under the pertinent statutory and decisional authority the copper cathodes in this case were no longer in customs custody at the time of the theft. Accordingly, an essential element of the offense prohibited by § 549 is missing, and we must reverse the judgment of conviction on Count III.

### V.

After careful consideration of other grounds for reversal advanced by appellants, which are enumerated in the Appendix to this opinion, we have concluded that such grounds are without merit.

### VI.

In conclusion and recapitulation, our review of the issues presented by these appeals convinces us that the copper cathodes had not reached their final destination at the time the theft occurred, and therefore were still part of a foreign shipment. Thus, the convictions for theft from a foreign shipment in violation of § 659 were proper.

Since the defendants were convicted of theft of the copper, the convictions under § 659 on the possession charge were improper and will be reversed. Furthermore, the facts of this case indicate that the shipment of copper was not still in customs custody at the time of the theft. Thus, the convictions under § 549 must be reversed. Accordingly, we will vacate the judgments with respect to the sentences imposed for receipt and possession of goods stolen from a foreign shipment and for removal of goods from customs custody. In all other respects, we will affirm the district court judgments of conviction and sentence.

### APPENDIX

Garber and Denucci also advance the following other grounds which they assert warrant reversal of their convictions:

(A) insufficiency of the evidence to sustain convictions of conspiracy under 18 U.S.C. § 371;[19]

(B) jury verdicts contrary to the weight of the evidence and unsupported by substantial evidence which reasonable men could be convinced beyond a reasonable doubt was true;[20]

(C) misconduct of the prosecutor in offering photographic exhibits representing the scene of the alleged crime which were not properly authenticated, in intimidating a defense witness while still under oath, and in introducing co-defendant's statement which the prosecutor failed to disclose under Fed.R.Crim.P. 16;[21]

(D) admission of evidence which should have been suppressed because the photographic identifications were impermissibly suggestive, because the consent to the first search was not voluntarily given, because the search warrants were not based on probable cause and lacked the necessary specificity, because the magistrate who issued the second search warrant was not

---

**18.** The final inspection was scheduled to be performed during the working hours of February 27. The defendants had removed the cases a few hours earlier, at 12:35 a.m. on February 27. *Mungo v. United States*, 423 F.2d 1351, 1357 (4th Cir. 1970).

**19.** Item 4 of appellant's brief at No. 79–2517. It is noted that appellant at No. 79–2511 incorporated, at page 37 of his brief, all the compatible arguments of appellant at No. 79–2517.

**20.** Item 5 of appellant's brief at No. 79–2517.

**21.** Item 6 of appellant's brief at No. 79–2517.

informed of the fact that a prior search had taken place, and because the statements obtained were involuntary and the product of coercion; [22]

(E) admission of statements without a showing that such statements were in furtherance of a conspiracy and also in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); [23]

(F) refusal to grant defendant's motion for bill of particulars which would have enabled him to prepare adequately for trial; [24]

(G) admission of a video tape re-enactment of the alleged crime without a proper foundation, which lacked probative value and was highly prejudicial, and failure to give limiting instructions on the evidentiary value of the video tape film; [25]

(H) admission of proof in variance with the indictment; [26]

(I) admission of inadmissible evidence in the nature of legal opinions dealing with the ultimate issue at trial; [27]

(J) undue restriction of defense counsel's cross-examination of a Government witness regarding his refusal to undergo a polygraph examination; [28]

(K) admission of photographic exhibits which were not authenticated; [29]

(L) refusal to allow an on-site inspection of the crime scene or an actual demonstration of the events introduced by the Government through its video tapes; [30]

(M) exclusion of relevant and probative evidence concerning the frequency of thefts which would have effectively refuted the Government's theory of the case; [31]

(N) admission of evidence of defendant's prior activities; [32]

(O) improper interference by the court with the examination of witnesses by rehabilitating Government witnesses and extensively cross-examining defense witnesses; [33]

(P) instructions to the jury which erroneously stated the law and unduly stressed the Government's case; [34]

(Q) denial of request to interrogate all jurors and erroneous restriction of the examination of two jurors.[35]

---

22. Item 7 of appellant's brief at No. 79–2517 and Item IV (p. 26) of appellant's brief at No. 79–2511.

23. Item 8 of appellant's brief at No. 79–2517.

24. Item 9 of appellant's brief at No. 79–2517.

25. Item 10 of appellant's brief at No. 79–2517 and Item 11 (p. 16) of appellant's brief at No. 79–2511.

26. Item 11 of appellant's brief at No. 79–2517.

27. Item 12 of appellant's brief at No. 79–2517.

28. Item 13 of appellant's brief at No. 79–2517 and Item III (p. 24) of appellant's brief at No. 79–2511.

29. Item 14 of appellant's brief at No. 79–2517.

30. Item 15 of appellant's brief at No. 79–2517.

31. Item 16 of appellant's brief at No. 79–2517.

32. Item 17 of appellant's brief at No. 79–2517.

33. Item 18 of appellant's brief at No. 79–2517.

34. Item 19 of appellant's brief at No. 79–2517.

35. Item 20 of appellant's brief at No. 79–2517.