**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael TOBIN, Ralph Reda, Dorothy Morse, a/k/a Dottie, and Marsha Morse, Defendants-Appellants.**

No. 77–5129.

United States Court of Appeals, Fifth Circuit.

July 17, 1978.

Stephen M. Zukoff, Miami, Fla. (Court-appointed), for defendant-appellant Tobin.

Theodore J. Sakowitz, Federal Public Defender, David K. Kelley, Jr., Asst. Federal Public Defender, Miami, Fla., for defendant-appellant Reda.

Richard M. Gale, Miami, Fla. (Court-appointed), Dottie Morse, pro se, Marsha Morse, pro se, for defendants-appellants Morse.

J. V. Eskenazi, U. S. Atty., Michael P. Sullivan, Charles O. Farrar, Jr., Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before WISDOM, TJOFLAT and VANCE, Circuit Judges.

WISDOM, Circuit Judge:

Michael Tobin, Ralph Reda, Dorothy Morse, and Marsha Morse thought that they were selling two stolen bronze statues to a shady art dealer. They did not know their "customer" was an FBI agent. At the time they negotiated the sale, neither they nor their "customer" realized that the more expensive statue they were selling was a fake. After a jury heard these and other facts, it convicted Tobin and the Morses of conspiracy to receive, conceal, store, sell and dispose of merchandise and goods which were moving and constituted interstate commerce; and of receiving, concealing, and storing goods worth over $5,000 moving in and constituting interstate commerce, knowing the goods to have been stolen, in violation of 18 U.S.C. §§ 2371, and 2315 (1976). Reda pleaded guilty to the conspiracy count. All four now attack these judgments, primarily on grounds that the government did not establish the necessary elements of movement in interstate commerce and value over $5,000. We find these, as well as the appellants' remaining, contentions without merit and affirm.

I.

In October 1974, a bronze statue was stolen from the Highlands Park, Illinois home of Mrs. Helen Peterson. Mrs. Peterson believed this statue to be an authentic casting of the "Bronco Buster" by the noted American artist Frederic Remington. Early the next month, a casting of a French "Revolutionary Soldier" by the French artist E. Picault, was stolen from the Winnetka, Illinois home of Mr. Norman Jennison. Both Highlands Park and Winnetka are Chicago suburbs. Mrs. Peterson received $20,000 for her loss from an insurance company. Mr. Jennison recovered $950.

Almost two years later, in July 1976, Ralph Reda told Michael Tobin during a barroom conversation in Fort Lauderdale, Florida, that he had two bronze statues to sell. These statues turned out to be castings of the Bronco Buster and the Revolutionary Soldier. Reda told Tobin that the statues had been stolen from a Chicago museum. Reda testified that he had known about the statues since July 1975. The record does not show how, or exactly when, the statues entered Florida. None of the defendants brought the statues into the state.

On July 12, 1976, FBI agent William Christiansen visited an antique shop operated by Dorothy Morse in Dania, Florida. Christiansen was posing as a burglar. He hoped to find six stolen paintings in the Morse shop.

The six paintings had been left with Dorothy Morse's daughter, Marsha Morse. Christiansen arranged to visit Marsha Morse's apartment the evening of July 12. When he arrived, however, the paintings were not there. Apparently, by this time

Tobin had spoken with Marsha Morse, for she asked Christiansen if he would be interested in obtaining two bronze statues. Marsha Morse told Christiansen that the statues had been stolen from a Chicago museum about four years ago. Christiansen indicated he might be interested in their purchase.

Christiansen and Tom McShane, another FBI agent, returned to Marsha Morse's apartment on August 5, 1974 to inspect the statues. Christiansen saw Reda and Tobin delivering the statues to the Morse apartment. McShane, who was posing as Christiansen's art appraiser, examined the statues. In the meantime, Christiansen spoke with Tobin. Tobin told him that the statues had been stolen from a Chicago museum. He also said that the statues had "cooled off". Marsha Morse and Tobin offered to sell both pieces of art for $15,000.

Nineteen days later, Christiansen told Dorothy Morse that he would buy the two bronzes. He agreed to pay $13,000 plus an extra payment of approximately $2,000 that the Morses planned to keep for themselves in addition to the payment they would receive from Reda and Tobin. After Christiansen spoke with Dorothy Morse, Marsha Morse arranged for Reda and Tobin to deliver the statues to her apartment the next day.

On August 25, Christiansen and McShane revisited the Morse apartment. They saw only the Bronco Buster statue. McShane examined it to confirm that it was the same one he had examined on August 5. After he determined that it was, Christiansen and Marsha Morse went to Christiansen's car to get the money.

At his car, Christiansen signalled other awaiting FBI agents to act. He then identified himself and arrested Marsha Morse. He next arrested Ralph Reda, who had been sitting outside the Morse apartment on the stairs. He also found and arrested Tobin on the fourth floor of the apartment building.

During this time, McShane had remained in the apartment with Dorothy Morse. When Dorothy Morse realized that the au-thorities had arrived, she told McShane to hide the Bronco Buster in a bathroom cabinet. Shortly thereafter, FBI agent Ronald Thixton entered the apartment and told the people in the room they were under arrest. During a subsequent search, he found the hidden Bronco Buster in the cabinet below the bathroom sink. Thixton testified that after he had arrested Dorothy Morse and advised her of her rights she told him that she was participating in the sale of the bronze statues, that she said had been stolen from a Chicago museum.

After the arrests, Tobin executed a form authorizing the FBI to search his car. The form stated that he could decline to consent to the search. In addition to signing the form, Tobin gave FBI agent Elie Scott the keys to his car. Scott found the Revolutionary Soldier in the trunk of Tobin's automobile.

The grand jury indicted all four defendants on a conspiracy and a substantive count. Ralph Reda pleaded guilty to conspiracy only the afternoon of the first day of trial. The district judge accepted his plea, subject to a showing at the trial of the other defendants that a factual basis for the plea existed. Reda testified for the prosecution. The FBI agents, Mrs. Peterson, Mr. Jennison, and both Morses also testified. Mr. Norman Jennison identified the statue of the Revolutionary Soldier as the one stolen from his home in November 1974. He based the identification on several features: "the base, the color of the base, the signature on it, the color of the statue, its unique color", and the loose sword.

The most surprising testimony came from Rudolph Wonderlich. Wonderlich is the president of Kennedy Galleries in New York City, and a recognized expert on Americana. The government had originally intended to have him establish the authenticity and value of the Bronco Buster.

Wonderlich did not see the Bronco Buster seized from the defendants until the morning of the second day of trial. At that time he discovered, and told the government, that the statue is a forgery. Wonderlich

testified that the statue is an excellent forgery that could fool many laymen. He explained to the jury how he determined that the statue is not genuine. First, the foundry stamping is atypical. Second, the stamping identifying the statue as casting No. 93 is too indistinct. Third, the base of the statue is about one-half inch higher than it should be, and the statue is about seven-sixteenths of an inch too short. Finally, the ears on the horse are misshaped. Wonderlich explained that on an early casting of the Bronco Buster such as No. 93 the horse's ears should be laid back flat and quite small. In contrast, the horse's ears in the statue he examined are rather large and stick outward. These characteristics are found only in castings of the Bronco Buster numbered above 260.

Wonderlich testified that the statue has value even though it is a forgery. The value of a forgery increases with its quality. As the basis of his valuation, Wonderlich used the 1970 sale of a known Bronco Buster forgery in New York for $3,500. Wonderlich testified that the statue he examined would sell for more because of its significantly better quality. He estimated a value between $5,000 and $7,000.

The district jury denied defense motions for acquittal. The jury then convicted the three defendants who went to trial on all counts. Post trial motions by all defendants were denied and judgments of guilty were entered. In this Court all the appellants attack the judgments on the grounds that the government did not prove movement in interstate commerce and value over $5,000.[1] They also contend that the trial judge gave an erroneous instruction on reasonable doubt, that there was a fatal variance between the indictment and the proof at trial, and that the judge should have granted their post-trial motion for an *in camera* inspection of the grand jury proceedings. In addition, Tobin argues that the Picault statue should not have been admitted as evidence against him because he was not given *Miranda* warnings before he consented to a search of his car.

## II.

The question whether property is moving in interstate commerce as required by 18 U.S.C. § 2315 is almost invariably one for the jury. *See, e. g., Pilgrim v. United States,* 5 Cir. 1959, 266 F.2d 486; *Lee v. United States,* 8 Cir. 1966, 363 F.2d 469, cert. denied, 385 U.S. 947, 87 S.Ct. 323, 17 L.Ed.2d 227; *Corey v. United States,* 9 Cir. 1962, 305 F.2d 232, cert. denied, 371 U.S. 956, 83 S.Ct. 511, 9 L.Ed.2d 503; *see also Powell v. United States,* 5 Cir. 1969, 410 F.2d 710 (interpreting identical interstate movement requirement in 18 U.S.C. § 2313). Reda, Tobin, and the Morses argue a jury could not reasonably have concluded that the evidence showed interstate movement for two reasons. First, the appellants contend that the government did not present enough evidence for the jury to conclude that the statues found in the Morse apartment and the statues stolen from Mrs. Peterson and Mr. Jennison are the same objects. If the evidence does not allow this conclusion, the appellants properly point out there was insufficient evidence for the jury to conclude that the statues ever crossed state lines. Second, the appellants contend

1. Reda's status on appeal differs from that of the others. The district judge accepted his guilty plea subject to a demonstration at trial that a factual basis for the plea existed. At the conclusion of the trial Reda made no specific motion that the plea be rejected. Instead, he moved to join in the post-trial motions of the other defendants. The district judge granted this motion, even though several of the contentions made by the other three defendants had no applicability to the validity of Reda's appeal. The district judge's denial of the motions for acquittal notwithstanding the jury's verdict must also be seen as a ruling that a factual basis for Reda's plea had been shown. There is no indication in the record that Reda ever attempted to withdraw his plea.

Reda filed a timely appeal from the judgment of guilty entered against him. He may appeal from a guilty plea, but the contentions he may raise are more limited than those available to a defendant appealing from a verdict after trial. *See, e. g.,* 2 L. Orfield, Criminal Procedure Under the Federal Rules § 11:13 (1966). We need not consider whether Reda has joined in arguments not available to him, however, since we find no merit in any of the contentions raised by any of the appellants.

that even if the statues were once moving in interstate commerce the evidence unquestionably shows that they had "come to rest" and lost their interstate character before the defendants obtained them.

■ To support their argument that there was insufficient evidence that the statues came from Illinois, Reda, Tobin, and the Morses rely upon the revelation that their Bronco Buster is a forgery. Because Mrs. Peterson testified that she owned an original, the appellants argue that it was irrational for the jury to conclude that the forgery seized in the Morse apartment had been stolen from Mrs. Peterson. The fundamental error in this argument is that there was ample evidence from which the jury could conclude that Mrs. Peterson actually owned the forged bronze.

The evidence, of course, must be considered in the light most favorable to support the verdict. *Glasser v. United States,* 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. Wonderlich testified that the statue found in the Morse apartment is an excellent forgery that could fool a layman. Mrs. Peterson admitted that she is not an art expert. She also admitted that she never saw any documentation that her statue was genuine, but merely assumed that her first husband (who purchased the statue) obtained the appropriate documents. Mrs. Peterson identified the statue in the courtroom as the one stolen from her home, and told the jury that she knew the statue was hers because she had lived with it and dusted it for years. In addition, the jury had the benefit of Wonderlich's detailed description of the statue. The evidence included a clear photograph of the statue taken from Mrs. Peterson's home. The jury could have compared Wonderlich's description of the distinctive features of the horse's ears in the forgery with the photograph and determined if the photograph matched the statue in evidence. That the Bronco Buster was paired with a Picault Revolutionary Soldier

also suggests that the statues came from Illinois, since a Bronco Buster and a Revolutionary Soldier were stolen from the same area of Illinois at about the same time. There is little doubt that the Picault statue seized from the defendants was the one stolen in Winnetka. Jennison clearly identified the statue.

■ A jury may conclude that an item once moving in interstate commerce has "come to rest" and lost its interstate character so that subsequent attempts to receive, conceal, sell or dispose of it will not violate 18 U.S.C. § 2315.[2] *E. g., Pilgrim v. United States; Lee v. United States; Corey v. United States; Powell v. United States; United States v. Segelman,* 1949, W.D.Pa., 86 F.Supp. 114. The jury need not do so, however, simply because an item has reached the state where it is sold or intended to be sold (destination state). *Corey v. United States,* 305 F.2d at 236. So long as its movement within the destination state can be considered a continuation of the movement that began out of state the prerequisite of 18 U.S.C. § 2315 is satisfied. *See id.; Lee v. United States,* 363 F.2d at 475; *Powell v. United States,* 410 F.2d at 713; *cf. Walling v. Jacksonville Paper Co.,* 1942, 317 U.S. 564, 568, 63 S.Ct. 332, 87 L.Ed.2d 460 (interstate commerce requirement of the Fair Labor Standards Act); *United States v. Cadillac Overall Supply Co.,* 5 Cir. 1978, 586 F.2d 1078 (interstate commerce requirement of the antitrust laws). The government need not exclude every speculative possibility that the transportation may have been interrupted at some point within the state of destination in a manner that would terminate its movement in interstate commerce. *Corey v. United States,* 305 F.2d at 232. Nor need the government show each step in the property's movement in interstate commerce. Such a requirement would impose an almost impossible burden on the prosecution; crim-

---

**2.** Of course, that property has come to rest does not shield those who acted to receive, conceal, sell, or store the property *before* it left interstate commerce, from 18 U.S.C. § 2315. Thus, the original thief might be prosecuted under § 2315 even if an innocent purchaser who kept the property long enough to break the interstate journey and then sold it could not be.

inals are not noted for their record keeping. It is immaterial that the defendant's concealment of the property was restricted to the portion of the interstate journey occurring wholly within the destination state. *Corey v. United States,* 305 F.2d at 237.

A transfer of property from the original thief to another person may be in such circumstances that the item leaves interstate commerce. *Powell v. United States,* 410 F.2d at 713; *Schwachter v. United States,* 6 Cir. 1956, 237 F.2d 640, 644. On the other hand, such transfers may be an integral part of the illegal movement. For example, the thief may transfer the stolen property to a "fence" who intends to resell it.

The time a stolen object remains in the destination state may also indicate it has left interstate commerce. *E. g., Lee v. United States,* 363 F.2d at 475. Other factors, however, may negate this inference. For instance, if a stolen item is concealed so that it may "cool off" or until its price rises, the concealment is an integral part of the movement in interstate commerce rather than a break in it. *See id.* Any other rule would mean that 18 U.S.C. § 2315 would not apply to thefts of famous and easily identified objects when a long (and perhaps deliberate) delay between the theft and the sale to a buyer has occurred. The law should apply to the theft of the Hope Diamond as well as that of a $5,000 engagement ring, regardless of cooling off period.

Reda, Tobin, and the Morses stress that the statues arrived in Florida at least two years before they were found in the Morse apartment. There was ample evidence for the jury to conclude that even this long delay did not interrupt the movement of the statues in interstate commerce. Tobin's statements that the statues had been "buried" and allowed to "cool off" would allow the jury to conclude that the long concealment had been to aid resale. The jury could infer that the statues were relatively easy to identify and that it might, therefore, be difficult to find a buyer if the statues were marketed too soon after the theft. The evidence that whoever transferred the statues to Tobin told Tobin that the art was stolen from Chicago suggests that everyone who had the statues between Fall 1974 and July 1976 knew that they were stolen. This, in turn, permits the inference that any transfers from the original thief were part of the resale process.

### III.

Reda, Tobin, and the Morses also rely upon the revelation that their Bronco Buster is a fake to argue that a jury could not reasonably conclude that the two statues had a value over $5,000. The value of an item for purposes of § 2315 is that which a willing seller would pay a willing buyer at the time and place the property was stolen. *Herman v. United States,* 5 Cir. 1961, 289 F.2d 362, cert. denied, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93. Because there is little dispute the Picault statue was worth $950, the evidence must allow the jury to conclude that the forged Bronco Buster was worth at least $4,050. The testimony by Wonderlich, an acknowledged authority in the field of American art, provides a sufficient foundation for that conclusion. Indeed, one defense lawyer conceded at oral argument that if the jury credited Wonderlich's testimony it could find that the government had established value of at least $5,000.

### IV.

The district judge instructed the jury on the meaning of reasonable doubt as follows:

A reasonable doubt means a doubt that is based upon reason and common sense and exists in every case when, after a careful and impartial consideration of all the evidence, the jurors do not feel convinced to a moral certainty that the defendant is guilty of the crime charged. A defendant is never to be convicted on mere suspicion and conjecture. Such a doubt, however, must be a doubt that is reasonable and one that arises from the evidence or the lack of it. It does not mean a doubt that is possible, speculative or

imaginary, since everything relating to human affairs is open to a possible or imaginary doubt. It is the kind of doubt that would cause a reasonable person to refrain from making a decision, or taking an important step in some serious matter in his or her personal life.

The defense objected to this instruction and requested that the district judge define reasonable doubt in terms of a doubt that would cause a reasonable person to "hesitate" from acting rather than to "refrain" from acting. The defense called the district judge's attention to *United States v. Richardson,* 5 Cir. 1974, 504 F.2d 357. In *Richardson* the district court instructed that proof beyond a reasonable doubt is established if the jurors "would be willing to rely and act upon" the evidence in their most important personal affairs. This Court criticized the "would be willing to act" form of instruction, and urged district courts to employ the "would not hesitate" language in their reasonable doubt instructions. 504 F.2d at 361. *Accord United States v. Patman,* 5 Cir. 1977, 557 F.2d 1181, 1182; *United States v. Turk,* 5 Cir. 1976, 526 F.2d 654, 669, *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 8; *see also Holland v. United States,* 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. A good example of the preferred form of instruction is contained in *United States v. Prince,* 5 Cir. 1975, 515 F.2d 564, 566 n.1.

■ The word "refrain" means "to hold back; to restrain; to check; to put a restraint upon; to curb; govern" or "to abstain from; to give up; avoid; shun". *Webster's New International Dictionary of the English Language* (2d ed.) (unabridged) (1958). The district court's instruction, therefore, was equivalent to a "would be willing to act" instruction. Despite the clear direction from this Court to avoid that form of reasonable doubt instruction, the district court refused to revise its charge to the jury.

That refusal, however, was not reversible error. Several Circuits that have expressed a preference for the "would not hesitate" form of reasonable doubt instruction—including this one—have held that the failure to use that form even over objection is not necessarily reversible error. *E. q., United States v. Turk,* 526 F.2d at 669; *United States v. Leaphart,* 10 Cir. 1975, 513 F.2d 747, 749–50; *United States v. Emalfarb,* 7 Cir. 1973, 484 F.2d 787, 790–91; *United States v. Nuccio,* 2 Cir. 1967, 373 F.2d 168, cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (semble) (not clear whether objection made at trial); *see also United States v. Acarino,* 2 Cir. 1969, 408 F.2d 512, 517 (the Court used a plain error standard, but concluded that there was "no reversible error plain or subtle").

By itself, the sentence in the district court's instruction using the word "refrain" might have improperly reduced the prosecutor's burden of proof. The instruction, however, must be considered as a whole. *See United States v. Steinkoenig,* 5 Cir. 1973, 487 F.2d 225; *James v. United States,* 5 Cir. 1969, 416 F.2d 467, *cert. denied,* 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87. The earlier sentence defining reasonable doubt in terms of "moral certainty" insured that the jury would not employ too lax a standard of proof. *See United States v. Smaldone,* 10 Cir. 1973, 485 F.2d 1333, 1348. The charge as a whole "conveyed the proper idea" of reasonable doubt. *United States v. Steinkoenig,* 487 F.2d at 230.

Although we do not reverse this case, we repeat and emphasize the preference for the "would not hesitate" form of instruction on reasonable doubt expressed in *Richardson, Turk,* and *Patman.* In the future, this district judge, and all other district judges who have not done so, should revise their instructions to follow the opinions of this Court.

## V.

■ The appellants' remaining contentions deserve little comment. They argue that there was a fatal variance between the indictment and the proof at trial because the indictment refers to "the bronze statue 'Bronco Buster' by Frederick [sic] Remington"—in other words, an original—while at trial the government produc-

ed a fake. The rule that the allegations in an indictment must correspond to the proof at trial is based on three considerations: (1) that the accused have proper notice of the charges against him; (2) that there be no infringement of the accused's right to be tried only on charges presented in an indictment by grand jury; and (3) that an accused be protected against another prosecution for the same offense. *E. g., United States v. Guthartz,* 5 Cir. 1978, 573 F.2d 225. These requirements were all satisfied in this case. The use of Remington's name was only to identify the statue. There was no confusion which statues were involved in the prosecution.

Tobin argues that the Revolutionary Soldier should not have been admitted as evidence against him because he was not given *Miranda* warnings before he consented to the search of his car. In *United States v. Garcia,* 5 Cir. 1974, 496 F.2d 670, 673–75, this Court held that *Miranda* warnings are not an absolute prerequisite to a finding that consent to a search was voluntarily given. The district court's finding that Tobin's consent was voluntary is not clearly erroneous.

Finally, the appellants complain because the district court denied their motion for an *in camera* inspection of the grand jury minutes. They have presented no valid reason why that motion should have been granted.

The judgments are AFFIRMED.