UNITED STATES of America, Plaintiff–Appellee,

v.

Angel PETIT, Roger Fernandez, Francisco Pasqual, Defendants–Appellants.

No. 86–5945.

United States Court of Appeals, Eleventh Circuit.

April 11, 1988.

Ana–Maria Carnesoltas, P.A., Coral Gables, Fla., for Petit.

Pedro R. Echarte, Jr., Miami, Fla., Thomas Martin Pflaum, Simon Schindler Hurst Sandberg, P.A., for Fernandez.

Stephen H. Rosen, P.A., Coral Gables, Fla., for Pasqual.

Leon B. Kellner, U.S. Atty., Miami, Fla., Jeffrey B. Crockett, Andrea M. Simonton, Linda Collins Hertz, Asst. U.S. Atty., for U.S.

Before KRAVITCH and CLARK, Circuit Judges, and ESCHBACH[*], Senior Circuit Judge.

KRAVITCH, Circuit Judge:

In this sting operation, the government obtained the permission of a carrier of electronic equipment to use the equipment while it was en route to its purchaser. As a result of their efforts to purchase the equipment, Roger Fernandez, Francisco Pasqual, and Angel Petit were convicted of conspiracy to possess stolen goods, in violation of 18 U.S.C. § 371.[1] Five issues are presented on their appeal: (1) whether appellants were properly convicted of conspiring to receive and possess goods "stolen" from interstate commerce; (2) whether the goods were in "interstate commerce" at the time of the sting operation; (3) whether the trial court should have granted a continuance after the superseding indictment was issued; (4) whether the admission of Pasqual's post-arrest statements violated Petit's right to cross-examine witnesses; and (5) whether the evidence was sufficient to sustain Petit's conviction.

[*] Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

[1]. The underlying offense of the conspiracy is prescribed by 18 U.S.C. § 659.

I.

Carlos Devarone, a detective with the Hialeah, Florida Police Department, set up several sting operations to target fences of stolen goods. A confidential informant had given Devarone the names of possible fences, including that of appellant Roger Fernandez. Devarone, acting undercover, and accompanied by the informant, met with Fernandez on July 18, 1986. Devarone testified that Fernandez initially was interested in buying the two television sets that Devarone had brought to the meeting, but was advised that they were for Devarone's personal use. The informant told Fernandez, however, that he and Devarone had a tractor-trailer full of similar electronic equipment to sell. Devarone testified that he told Fernandez that the property was stolen and that it was coming from "up north." According to Devarone, Fernandez agreed to purchase the stolen equipment for $94,000, although its actual value would be much higher, and the parties set a delivery date for the following week.

Ten days later, Devarone, wearing a concealed tape recorder, and the informant arrived at Fernandez's place of business, accompanied by an undercover Metro–Dade police officer driving a North American Van Lines tractor-trailer load of Magnavox and Sylvania television sets, video cassette recorders, stereo radio cassette recorders, and clock radios. The electronic equipment, which had been shipped from Tennessee, had not yet been delivered to its Miami purchasers,[2] and was used in the sting operation with the consent of its carrier. Fernandez was present when the loaded truck arrived, as were codefendants Emerio Delgado and Jaime Villeda, two of Fernandez's employees. Appellant Pasqual arrived shortly thereafter. After some confusion about where the equipment was to be unloaded and stored, Pasqual called appellant Petit and obtained permis-

[2]. Triple A Cooper Transportation Company in Medley (in the metropolitan Miami area) and the Doral Hotel and Country Club in western Miami.

sion to use "A–1 Auto Repairs," located in a small warehouse. When the tractor-trailer arrived there, the warehouse had been almost entirely cleared of cars. At Pasqual's request, Petit, a mechanic at the warehouse, moved the two remaining cars outside. Pasqual also asked the other defendants to look around the area of the warehouse to determine whether any police officers were nearby. Because the driver was having a difficult time parking the truck, several neighbors came outside to watch, which made Petit very nervous. According to Devarone, Petit urged the other defendants to hurry and finish unloading the truck because he was afraid that the neighbors' suspicions would be aroused by the unloading of television sets into a warehouse where automobiles were supposedly being repaired. Other proffered explanations for Petit's nervousness, however, include his fear that the truck would hit some of his customer's cars or that his boss would return to find him neglecting his job.

Because he had not yet been shown any money for the goods, Devarone ordered the unloading to stop, not to be resumed until he saw that the defendants actually had the money to pay for the merchandise. When the money failed to materialize, the police and Federal Bureau of Investigation (FBI) agents moved in and arrested all of the defendants, including appellants.

Appellants initially were charged with conspiring to steal goods valued in excess of $100.00 which were moving in interstate commerce, in violation of 18 U.S.C. § 659. Although the first indictment mistakenly charged that the alleged conspiracy both began and concluded on June 30, 1986, it correctly provided that the overt acts taken in furtherance of the conspiracy took place between July 1 and July 28, 1986. Several days before trial, the government issued a superseding indictment which extended the ending date of the conspiracy to July 28, 1986, the date of the defendants' arrest. The superseding indictment also modified the purpose of the conspiracy, alleging that the defendants conspired to receive and possess stolen goods which constituted an interstate shipment of freight.

Following a jury trial, appellants Roger Fernandez, Angel Petit, and Francisco Pasqual were convicted. Defendants Emerio Delgado and Jaime Lopez Villeda were acquitted.

## II.

### A. *Were appellants properly convicted of conspiring to receive stolen goods?*

Appellants were convicted under 18 U.S.C. § 371 [3] of conspiring to commit a crime prohibited by 18 U.S.C. § 659.[4] On appeal they argue that their convictions are invalid because a conviction under section 659 requires the government to prove that the defendants bought, received, or possessed goods which were actually stolen.[5] They point out that the electronic equipment in this case had not been stolen but rather had been borrowed by the government with the carrier's permission. Accordingly, they contend that because they could not have been convicted of the substantive offense of possessing stolen merchandise, they should not have been convicted of conspiring to commit the substantive offense.

---

**3.** This statute provides in part:
   If two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**4.** This statute provides in pertinent part:
   Whoever embezzles, steals, or unlawfully takes by any fraudulent device, scheme, or game, from any railroad car, bus, vehicle, steamboat, vessel, or aircraft operated by any common carrier moving in interstate or foreign commerce or from any passenger there-

on any money, baggage, goods, or chattels, knowing the same to have been embezzled or stolen—
   Shall in each case be fined no more than $5,000 or imprisoned not more than ten years, or both....

**5.** They cite *United States v. Monasterski*, 567 F.2d 677, 684 (6th Cir.1977) ("one cannot be convicted of receiving stolen goods when actual physical possession of the stolen goods has been recovered by their owner or his agent before delivery to the intended receiver").

■ Although some courts have recognized an impossibility defense with regard to attempted crimes, *People v. Jaffe*, 185 N.Y. 497, 78 N.E. 169 (1906) (no conviction allowed for attempt to receive stolen property when the property had been restored to its owners and was used with their permission at the time it was offered to the defendant), "[c]ourts have generally taken a broader view of the purposes of the law of conspiracy." W. LaFave & A. Scott, *Criminal Law* 475 (1972). As one commentary has explained:

> The antisocial potentialities of a conspiracy, unlike those of an attempt, are not confined to the objects specifically contemplated at any given time. The existence of a grouping for criminal purposes provides a continuing focal point for further crimes either related or unrelated to those immediately envisaged. Moreover, the uneasiness produced by the consciousness that such groupings exist is in itself an important antisocial effect. Consequently, the state has an interest in stamping out conspiracy above and beyond its interest in preventing the commission of any specific substantive offense.

*Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 924–25 (1959). While a charge that a crime has been attempted or committed focuses on the defendant's *conduct* leading toward the commission of the crime, a charge of conspiracy is concerned more with the *intent* of the alleged perpetrators. "The crime of conspiracy is complete once the conspirators, having formed the intent to commit a crime, take any step in preparation....," *State v. Moretti*, 52 N.J. 182, 187, 244 A.2d 499, 502, *cert. denied*, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968), and it is unnecessary that the substantive crime itself be committed. *United States v. Rose*, 590 F.2d 232 (7th Cir.1978),

*cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979).

■ Accordingly, this circuit has held that for a conspiracy conviction under section 371 to stand, "the government did not have to prove that the [items] were *actually* stolen; it was enough for the government to show that the conspirators conspired [to receive goods] which they *believed* to be stolen." *United States v. Sarro*, 742 F.2d 1286, 1297 (11th Cir.1984) (emphasis in original). *See also United States v. Bobo*, 586 F.2d 355, 371 (5th Cir.1978) (to affirm conspiracy conviction, "it need not be shown that the substance [purchased by the defendant] was in fact heroin as long as he thought he was buying a controlled substance and believed he was furthering the ends of the conspiracy"), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979); [6] *United States v. Thompson*, 493 F.2d 305 (9th Cir.) (for conviction of conspiracy to smuggle marijuana to stand, it was unnecessary that the government prove that the substance involved was actually marijuana), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974); *United States v. Rose*, 590 F.2d at 235 (rejecting defendants' argument that conspiracy to transport stolen goods in interstate commerce could not exist unless the goods had actually been stolen).[7] In this case, the government provided ample evidence from which the jury could have concluded, beyond a reasonable doubt, that the alleged conspirators believed the goods to have been stolen: Devarone's testimony that he told Fernandez that the goods were stolen, the taped conversations between the government agents and several of the defendants, the agreed-upon price which was far below the value of the merchandise, the slang expressions for stolen goods used by some defendants, and the defendants' actions in scouting around the warehouse

6. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (in banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.

7. *But see United States v. Binetti*, 552 F.2d 1141 (5th Cir.1977) (where distributed substance was

a harmless, non-controlled substance rather than cocaine, appellant's conviction of conspiring to possess and distribute cocaine could not stand; unclear from opinion whether appellant *believed* the substance to be cocaine or knew that it was harmless).

looking for police. As such, although appellants could not have been convicted of the substantive offense of receiving stolen property, their convictions for conspiring to receive stolen property cannot be reversed on this ground.

B. *Were the goods in interstate commerce at the time of the sting operation?*

■ Section 659 of Title 18 of the United States Code provides sanctions against any person who:

[S]teals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any ... motortruck, or other vehicle ... with intent to convert to his own use *any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property;* or

Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen....

(Emphasis added). In order to sustain a conviction of conspiracy to receive stolen goods in violation of this section, it is unnecessary that the government prove that the defendants had knowledge that the goods were moving in interstate commerce. *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *United States v. Viruet,* 539 F.2d 295, 297 (2d Cir.1976); *Cf. United States v. Beil,* 577 F.2d 1313 (5th Cir.1978) (knowledge that property has moved or will move in interstate commerce not required to sustain conviction of conspiracy to violate 18 U.S.C. §§ 2312, 2313), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). The government is required to prove, however, that the goods were a part of interstate commerce within the meaning of section 659. In this case, the district court instructed the jury that "a shipment from one state to another remains an interstate shipment in the destination state until it arrives at its final destination and is there

delivered." He also charged the jury that so long as the goods had not reached their final destination, delays en route did not remove them from interstate commerce.

■ Appellants argue that the goods in this case were not in interstate commerce, and accordingly that their convictions are invalid for lack of federal jurisdiction. First, they contend that Miami itself, rather than the eventual delivery point within Miami, was the final destination of the goods.[8] Accordingly, because the goods had arrived in Miami before their use in the sting operation, appellants assert that any interstate travel by the shipment had concluded before the goods were borrowed by the government.

The test for determining whether a shipment of goods is in interstate commerce is

a practical one, depending upon the relationship between the consignee, consignor, and carrier, the indicia of interstate commerce at the time the theft occurs, and the preservation of the congressional intent.

*United States v. Gates,* 528 F.2d 1045, 1047 (5th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (1976) (quoting *United States v. Cousins,* 427 F.2d 382, 385 (9th Cir.1970)). Federal courts have held, "given the all-inclusive sweep of its terminology, that Section 659 is designed by the Congress to promote the flow of goods in interstate commerce ... and that the carrying out of this purpose is not to be hampered by technical legal conceptions." *United States v. Astolas,* 487 F.2d 275, 279 (2d Cir.1973), *cert. denied,* 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). *See also United States v. Garber,* 626 F.2d 1144, 1147 (3d Cir.1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981); *United States v. Waronek,* 582 F.2d 1158 (7th Cir.1978). The appellants concede that the electronic equipment was a part of interstate commerce at least until it reached Miami. We agree with the government, however, that "an interstate shipment of goods 'does not lose its characteristic as such until it arrives at its final destination

---

**8.** Although appellant Petit does not make this argument in his brief, he has adopted by reference all parts of the brief of appellant Fernandez which are pertinent to his case.

*and is there delivered.' " United States v. Garber,* 626 F.2d at 1147–48 (3d Cir.1980) (quoting *United States v. Yoppolo,* 435 F.2d 625, 626 (6th Cir.1970)) (emphasis added).[9] In *Garber,* a shipload of copper cathodes en route to Bridgeport, Connecticut, was discharged instead at Philadelphia because of labor problems at the Bridgeport terminal. The shipper found the freight costs of sending the cathodes by land from Philadelphia to Bridgeport prohibitive, and thus it was forced to seek other buyers for the shipment. In the interim, the cathodes remained on a pier in Philadelphia, and it was from the pier that the defendants stole a number of the cathodes approximately a month after they had been unloaded. The court explicitly rejected the defendants' argument that the fact that the shipper did not have a specific purchaser in mind at the time of the theft removed the goods from commerce. Rather, it stated that the goods did not leave commerce until their *final* delivery was effected, quoting from *United States v. Gates,* 528 F.2d 1045 (5th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (1976). In *Gates,* on analogous facts, the former Fifth Circuit found that the consignee's refusal to accept delivery of goods did not remove the goods from interstate commerce. Because alternative arrangements would necessarily have been made to dispose of the shipment, the shipment remained in interstate commerce. Accordingly, the theft of the goods after the consignee had refused them was within federal jurisdiction.

■ Appellants could not have prevailed on this argument had the sting operation taken place somewhere along the route between Jefferson City, Tennessee, and Florida, rather than in Miami itself. It logically follows that so long as the goods are en route between the shipper and the custom-er it makes no difference whether the illegal activity takes place in the city of origin or city of destination. *See United States v. Astolas,* 487 F.2d 275 (2d Cir. 1973) (where goods had been loaded, sealed, and routed, and were merely awaiting the arrival of the shipper's own drivers to drive the trailers to their interstate destinations, goods had entered interstate commerce), *cert. denied,* 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). Therefore, because the goods remained in commerce from the time they were shipped until they were delivered to their purchaser, appellants' contention that the goods were no longer in interstate commerce once they arrived in Miami is simply erroneous.

■ Appellants' second argument is that the FBI's use of the goods in the sting operation removed them from interstate commerce by interrupting the natural passage of the goods from Tennessee to their delivery points in Miami. There is some authority to support appellants' position, *e.g., United States v. Tobin,* 576 F.2d 687, 692 (5th Cir.) ("So long as [the shipment's] movement within the destination state can be considered a continuation of the movement that began out of state the [statutory prerequisite] is satisfied"), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978);[10] *United States v. Sherman,* 171 F.2d 619, 622 (2d Cir.1948) (test for determining whether goods are in interstate commerce is if they have left the possession of the shipper and have come into the custody of someone who without more than inevitable pauses passes them along), *cert. denied,* 337 U.S. 931, 69 S.Ct. 1484, 93 L.Ed. 1738 (1949).[11] However, "[i]n order to constitute an offense under the statute, it is not necessary that the goods be actually moving in interstate commerce at the time of [illegal receipt]." *United States v.*

---

**9.** *See also Levi v. United States,* 71 F.2d 353, 354 (5th Cir.1934) ("An article once placed in interstate commerce continues therein at least until it reaches the point of destination.").

**10.** The defendants in *Tobin* were convicted of violations of 18 U.S.C. §§ 2314 and 2315 (1976). Prior to its amendment in 1986, § 2315 referred to interstate commerce with language virtually identical to that contained in 18 U.S.C. § 659.

**11.** *See also Barfield v. United States,* 229 F.2d 936, 939 (5th Cir.1956) ("Once the intended journey West got underway, any driving, no matter how circuitous or frequent the transitory diversions were, so long as it was a part of and would further the main journey, would amount to [interstate] transportation under [18 U.S.C.A. § 2312]").

*Williams*, 559 F.2d 1243, 1247 (4th Cir. 1977). As explained in *United States v. Astolas*, 487 F.2d at 279, section 659 provides three means by which the interstate commerce requirement may be met: "the goods can be (1) moving as an interstate shipment, (2) part of an interstate shipment, or (3) constituting an interstate shipment." Here, the fact that the electronic equipment was used in a sting operation did not change its constitution as an interstate shipment of goods.

The district court's instruction to the jury on this issue was derived from *United States v. Garber*, 626 F.2d at 1148, where the court stated, "Delays enroute do not deprive shipments of continued characterization as interstate ... so long as the goods have not yet reached their destination ... and the shipper or carrier intends to resume the journey." Appellants argue that the FBI's use of the goods cannot be viewed as an inadvertent pause or detour in the natural interstate transit process. Rather they contend that the actions of the FBI and the local police in borrowing the truckload of goods was merely an attempt to manufacture federal jurisdiction. Appellant Petit cites *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), a case involving the Travel Act, 18 U.S.C. § 1952. In *Archer*, a federal agent investigating New York City corruption placed several phone calls to Klein, one of the defendants, from Newark, New Jersey, for the sole purpose of having Klein speak in an interstate telephone call in order to obtain federal jurisdiction. Although Klein was not in, the agent left messages for him to return the calls, which Klein did. In reversing the defendants' convictions, the court stated:

> [w]hen Congress responded to the Attorney General's request to lend the aid of federal law enforcement to local officials in the prosecution of certain crimes, primarily of local concern, where the participants were engaging in interstate activity, it did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present. Manufactured federal jurisdiction is even more offensive in criminal than in civil proceedings.

The Seventh Circuit, in *United States v. Podolsky*, 798 F.2d 177 (7th Cir.1986) squarely confronted the issue of manufactured jurisdiction. In *Podolsky*, the appellant had been hired by a paid informant for the federal Bureau of Alcohol, Tobacco and Firearms to burn down a vacant building located at 2436 West Division Street in Chicago. Because the Bureau became concerned that there might be no federal jurisdiction over number 2436, the informant asked Podolsky to burn down number 2438 as well. After demanding and receiving assurances that no one would be inside number 2438, Podolsky and an accomplice went there prepared to burn it, but upon arrival, saw a light in one of the windows. Because they were afraid that someone might be inside, they went instead to burn number 2436, where they were arrested by federal agents. Podolsky was charged with conspiracy to burn number 2438, as opposed to 2436, because of the Bureau's jurisdictional concerns. Following his conviction, Podolsky, citing *Archer*, argued on appeal that his conviction should be set aside because the government had manufactured jurisdiction by steering him to number 2438. The court distinguished *Archer*: "The Bureau ... did not put 2438 West Division Street into interstate commerce; it was there all the time; they just induced Podolsky to direct his criminal intentions there." 798 F.2d at 180. Similarly, here the government persuaded the defendants to purchase goods which actually had been shipped in interstate commerce, rather than goods which had merely been shipped intrastate or which had not been shipped at all.

As noted by the court in *Podolsky*, federal courts have been extremely reluctant to set aside convictions on the sole basis of the principle announced in *Archer*. We agree with the Seventh Circuit that the decisions since *Archer* cast doubt "on the vitality of the independent principle announced there that forbids the 'manufacture' of federal jurisdiction in circumstances not constituting entrapment and not canceling any element of the crime such as

criminal intent." 798 F.2d at 177. Recognizing that cases may arise where governmental investigative conduct might be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), we conclude that the government's conduct in this case does not approach such a level. The decision to involve federal, as opposed to state, resources was made within the bounds of political, rather than judicial, discretion. The government possesses broad discretion in determining whom to prosecute, subject to constitutional constraints prohibiting the exercise of such discretion based on race or other invidious grounds. *See Podolsky,* 798 F.2d at 181; *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547 (1985). Allegations of selective prosecution or other such unconstitutional conduct were not made by the appellants. Accordingly, federal jurisdiction was proper in this case.

C. *Should the trial court have granted a continuance after the government returned a superseding indictment?*

■ Appellants contend that the trial court committed reversible error by refusing to grant a continuance when the government returned a superseding indictment two working days before trial was scheduled. Counsel for Fernandez did not receive the indictment until the day trial was scheduled to begin and the jury was selected. All of appellants' counsel requested that the court grant a continuance, preferably of at least two weeks, but a minimum of a day or two, in order to prepare for trial. The court denied their request, and the trial began the next day.

Appellants argue that the flaw in the original indictment—its allegation that all of the overt acts allegedly committed in

furtherance of the conspiracy took place after the alleged conspiracy had ended—was so great as to provide a complete defense to the offense charged. Because the government would have had to prove that an overt act occurred during the conspiracy, *United States v. Lichenstein,* 610 F.2d 1272, 1276 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980), appellants' initial defense relied on the fact that no overt acts could be shown to have taken place during the course of the conspiracy in the time frame alleged in the indictment. Appellants therefore argue that they were greatly prejudiced by the issuance of the superseding indictment, which corrected the dates of the alleged conspiracy.

The Supreme Court has established that the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161 *et seq.,* as amended, does not require that a defendant be granted a 30 day minimum preparation period after a superseding indictment is filed. *United States v. Rojas–Contreras,* 474 U.S. 231, 106 S.Ct. 555, 88 L.Ed.2d 537 (1985). Nor must a defendant be compelled to go to trial less than 30 days after the filing of such an indictment; rather, "[t]he Act itself places broad discretion in the District Court to grant a continuance when necessary to allow further preparation." *Id.,* 106 S.Ct. at 558.[12] In this instance the district court did not abuse its discretion in refusing to grant a continuance. The superseding indictment amended the original indictment in only two respects: (1) adding as an additional purpose of the conspiracy that appellants conspired to *receive* and *possess* stolen property, rather than merely to take the property unlawfully; and (2) changing the ending date of the conspiracy to the date of the appellants' arrest. Although the original indictment provided the correct dates for all of the overt acts alleged to have been committed in furtherance of the conspiracy, it charged that the conspiracy itself began and ended on the

---

**12.** This circuit had so held prior to the Supreme Court's decision in *Rojas–Contreras. See United States v. Hawkins,* 765 F.2d 1482, 1487 (11th Cir.1985) (district court must weigh the interests of a speedy trial with that of ensuring that

defense counsel has a reasonable time to prepare; the court's decision is reversible only for an abuse of discretion), *cert. denied,* 474 *U.S.* 1103, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986).

same day. Considering that the overt acts charged gave the defendants notice of the dates of their alleged misconduct, and that appellants have "not pointed to any important preparatory work which [their attorneys were] compelled to leave undone because of the change in the indictment," *United States v. Hawkins,* 765 F.2d 1482, 1488 (11th Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986), the district court did not abuse its discretion in denying a continuance.

D. *Did the admission of Pasqual's post-arrest statements violate Petit's right to cross-examine witnesses?*

Appellant Petit contends that the district court violated the Confrontation Clause, *see Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), by admitting into evidence his codefendant Pasqual's post-arrest statements without redacting their references to Petit. The Court in *Bruton* held that "a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh,* — U.S. ——, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987).[13]

Petit's argument derives from the testimony of two witnesses at trial. The first, FBI agent Joseph Edgley, stated that defendant Pasqual told him that "the unloaders" of the equipment—men who had not participated in any of the discussions with the undercover agents—were new acquaintances of his, and that they were unaware that the equipment had been stolen.[14] A second FBI agent, Juanita Benavides, testified that Pasqual told her that he had called a "friend," requesting to store some "stuff, television sets," at the friend's warehouse. From the evidence presented at trial, the jury was left with no other conclusion but that Petit was the "friend" who arranged for the storage of the goods. Petit argues that the inescapable conclusion from the combination of these statements was that he was not one of the "unloaders" who had been exculpated by Pasqual's statement. Accordingly, Petit contends that the clear inference from Pasqual's statements is that Petit participated in the conspiracy and *did know* that the goods were stolen.

Petit urges that the admission of Pasqual's confession through the testimony of agents Edgley and Benavides violated *Bruton* because the confession directly implicated Petit in the crime, and Petit had no opportunity to cross-examine Pasqual. We disagree that Pasqual's statements directly implicated Petit. The references to the

---

**13.** It is only "where a nontestifying codefendant's confession incriminating the defendant *is not directly admissible against the defendant ...* [that] the Confrontation Clause bars its admission at their joint trial...." *Cruz v. New York,* — U.S. ——, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987) (emphasis added). Under *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), an out-of-court statement is admissible against a defendant only if the statement's maker is unavailable as a witness and the statement bears a sufficient indicia of reliability. In *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), the Court set forth the necessary degree of reliability required to admit a codefendant's confession implicating a defendant, where the defendant has also confessed. The Court held that "[i]f those portions of the codefendant's purportedly 'interlocking' statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement

poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment." 106 S.Ct. at 2064–65.

In this case, the district court assumed that the statements Pasqual made to the government agents were admissible only against Pasqual, so instructing the jury. The prosecution did not object and has not argued on appeal that Pasqual's statement met the reliability test of *Lee.* Additionally, neither Pasqual's nor Petit's post-arrest statements were taped or transcribed and reviewed by the appellants. Rather, their statements were admitted via the oral recollection, refreshed by references to notes, of the agents to whom the statements were made. Under these circumstances, at this stage of review we decline independently to undertake a *Lee* analysis.

**14.** The jury apparently understood Pasqual to refer to defendants Emerio Delgado and Jaime Lopez Villeda, who were acquitted at trial.

"unloaders" and to the "friend" did not mention anyone by name, and no part of the confession actually referred to Petit by name. Moreover, before agents Edgley and Benavides were questioned about the statements that Pasqual had made to them, the judge instructed the jurors that they could consider the testimony only as to the defendant Pasqual. Therefore, rather than serving as "powerfully incriminating" evidence against Petit, Pasqual's statements "were not incriminating on [their] face, and became so only when linked with evidence introduced later at trial." *Richardson v. Marsh,* — U.S. —, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987).

■ The Court in *Richardson* held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, *but any reference to her existence.*" 107 S.Ct. at 1709 (emphasis supplied). The Court added in a footnote that it expressed no opinion as to the admissibility of a confession "in which the defendant's name has been replaced with a symbol or neutral pronoun." *Id.* at n. 5. In this case, Pasqual's statement that he called a "friend" who gave permission for the goods to be stored at his warehouse, when considered with the other evidence, could reasonably be understood only as referring to Petit. Accordingly, although Pasqual's confession did not directly implicate Petit in the conspiracy, it sufficiently inculpated him so as not to fall under the

clear exception to *Bruton* provided by the Court's decision in *Richardson.*[15]

■ Even though the admission of Pasqual's confession referring to Petit violated *Bruton,* such violations are subject to the harmless error rule. *See Cruz v. New York,* — U.S. —, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As the Court stated in *Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972), "[i]n some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." Petit's own admissions may be considered in determining whether this confrontation clause violation was harmless. *Cruz,* 107 S.Ct. at 1719.

■ On direct examination at trial, FBI agent Juanita Benavides testified that she interviewed Petit on July 28 after he waived his *Miranda*[16] rights. From memory, she stated that he told her that "he had received a telephone call some time that morning from this individual asking him if he could bring some stuff later on. He says probably television sets to his warehouse." According to Benavides, Petit stated that he had previously stored some business papers for this individual, and that he thought he probably would be paid for storing these items. Benavides

15. If the only statement contested by Petit had been Pasqual's statement that the unloaders were unaware that the merchandise was stolen, he would not state a sufficient *Bruton* claim. In *United States v. Garrett,* 727 F.2d 1003 (11th Cir.1984), *aff'd on other grounds,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), statements of a nontestifying codefendant, referring to "underlings" and "charges" in connection with his drug smuggling scheme, were admitted. This circuit rejected the defendant's claim that admission of these out-of-court statements violated his right to cross-examine witnesses, finding that "[t]hese isolated references to anonymous subordinates by no means directly implicated [the defendant]," also finding that the statements "did not provide the slightest hint as

to [the other defendants'] particular identities." 727 F.2d at 1013–14. Here, however, Pasqual's statement that he called "a friend" to arrange for storage of the "things," when considered with the other evidence, could only be understood as referring to Petit. Hence, we face a situation similar to that in *Serio v. United States,* 401 F.2d 989, 990 (D.C.Cir.1968) (per curiam), where Serio's name was deleted from his codefendant's confession and replaced with terms such as "another man," and similar to that described by the Supreme Court in footnote 5 of its opinion in *Richardson,* 107 S.Ct. at 1709.

16. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

also testified on direct that Petit told her he suspected that the goods might be stolen, but that he did not want to ask any questions of the individual for whom he was storing them.

On cross examination, counsel for Petit asked Benavides to read from her notes of Petit's interview, which were written partly in Spanish and partly in English. Benavides translated her notes into English: "It did surprise them, this individual was bringing in TVs, but he did not bother to ask why." Additionally, Benavides admitted that her notes of the interview did not contain in either Spanish or English a statement by Petit that he suspected the television sets were stolen. Benavides further admitted that she was not surprised that there were factual inaccuracies between her testimony before the grand jury in seeking the indictment and the facts as elicited at trial, as she had been called at the last minute to testify before the grand jury, because the case agent had to testify in another matter.

The other evidence against Petit came from the testimony of officer Devarone. He testified that after the first location for storing the goods proved to be unsuitable, Pasqual told him that he had already spoken to a person at a second location, where they were already in the process of moving out cars. According to Devarone, when the truckload of merchandise arrived at the warehouse, Pasqual asked Petit to move the two cars remaining in the warehouse. Devarone further testified that Petit was "a little upset because all the neighbors in the area were watching and he was afraid that they were going to call the police or something, because [the driver] was having a hard time parking the vehicle." Devarone stated that Petit said that it looked suspicious for them to be unloading televisions into an automobile repair warehouse, and that he wanted them to hurry up with the unloading. Devarone also tes-

tified that all five defendants participated in the unloading, and that Petit stored some of the goods in the warehouse office. However, Metro–Dade Police Detective Hugo Gomez, who maintained surveillance over the delivery and unloading of the merchandise, testified that "the gentleman with the white hair," apparently referring to Fernandez, was "most upset" about the problems the driver had parking the truck. In contrast, Gomez described Petit as "at the doorway just watching [the driver] and keeping an eye on the vehicles parked out there. Probably they were his customers." Gomez also testified that although he remembered seeing the other defendants, he could not recall whether or not Petit participated in unloading the electronic equipment.

In view of all of the testimony regarding Petit's participation in the conspiracy, applying a *Chapman* [17] harmless error analysis, we find that the admission of Pasqual's statements referring to Petit, albeit a *Bruton* violation, was harmless beyond a reasonable doubt. Although the totality of the evidence against Petit was less than that against the other appellants, given Petit's post-arrest admissions, his statements and behavior during the unloading of the truck as attested to by officer Devarone, and especially Devarone's properly admitted testimony corroborating the fact that Pasqual had called a person at a small warehouse to arrange for the storage of the goods, we conclude that the *Bruton* violation was harmless beyond a reasonable doubt.

E. *Was the evidence sufficient to support Petit's conviction?*

Petit has also argued that the evidence against him was insufficient to support his conviction. [18] Given our determination that the *Bruton* violation was harmless beyond a reasonable doubt, we

---

17. In *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

18. Under *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150–51, 57 L.Ed.2d 1 (1978), "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient...."

**1558**

must reject this contention. Challenges of insufficient evidence are reviewed under a less stringent standard than that used in harmless error analyses; whereas the *Chapman* test for finding a constitutional violation harmless requires proof "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828, the test for weighing sufficiency of the evidence to support a conviction is whether based upon the evidence a reasonable trier of fact could find guilt beyond a reasonable doubt. In determining whether the evidence was sufficient to support a conviction, we must view " 'the evidence and all reasonable inferences flowing therefrom in the light most favorable to the Government,' " *United States v. Franklin*, 586 F.2d 560, 565 (5th Cir.1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1536, 59 L.Ed.2d 789 (1979) (quoting *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1084 (5th Cir.), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978)), and " 'it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilty, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.' " *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983) (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) (footnote omitted), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)). Given our conclusion that the *Bruton* violation was harmless beyond a reasonable doubt, we find that the properly admitted evidence provides a sufficient basis for the jury's decision to convict, especially in light of the fact that it was unnecessary for the government to prove that Petit knew all of the details of the conspiracy, so long as it was proven that he knew the essentials of the conspiracy. *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2107, 68 L.Ed.2d 324 (1981). Accordingly, we reject Petit's contention that the evidence was insufficient to support his conviction.

### III.

For the foregoing reasons, we AFFIRM appellants' convictions.